Don Roger NORMAN, Roger William Norman, South Meadows Limited Properties Partnership, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–667 L.

United States Court of Federal Claims.

Dec. 10, 2004.

Nancie G. Marzulla, Washington, D.C., attorney for plaintiffs. Roger J. Marzulla, Washington, D.C., of counsel.

Dorothy R. Burakreis,[1] Washington, D.C., and Brian Heslin, Washington, D.C., for defendant. Lisa Clay, U.S. Army Corps of Engineers, Sacramento, California, of counsel.

## OPINION

BUSH, Judge.

This takings case is before the court following a trial held December 1st through 9th, 2003 in Washington, D.C. Plaintiffs seek just compensation under the Fifth Amendment, alleging that the government took without compensation 220.85 acres of plaintiffs' property by requiring plaintiffs to set aside this acreage as mitigation wetlands in consideration of obtaining a Section 404 permit to fill and impact other wetlands under the Federal Water Pollution Control Act (FWPCA) Amendments of 1972, Pub.L. No. 92–500, § 404, 86 Stat. 816 (1972) (codified at 33 U.S.C. § 1344 (2000)). In essence, plaintiffs challenge the Corps' action to require a landowner to create and build mitigation wetlands in exchange for impacting other wetlands in an effort to assure no net loss of

---

1. As of September 10, 2004, *Terry M. Petrie,* Washington, D.C., for defendant.

wetlands, arguing that such a mitigation requirement constitutes a compensable taking. Based on the evidence presented at trial, and for the reasons that follow, the court concludes that plaintiffs are not entitled to recover compensation, as no taking of property has occurred.

## I. FINDINGS OF FACT

### A. Background

The background of this case spans over a decade of land acquisitions, purchases, sales, development plans, permit applications and issuances, with ever-changing persons, parties, companies, partnerships and entities involved. Because of the complex nature of this matter, the court has taken every measure possible to clearly and accurately describe the facts presented at trial. We ask the reader of this opinion to patiently follow the court as we recount a seemingly endless chronology of transactions and wade through the numerous acreage values, property values and land descriptions necessary to accurately render this opinion.

### 1. Plaintiffs Purchase The Double Diamond Ranch

Plaintiffs are the father and son real estate development team of Don Roger Norman and Roger William Norman (Normans), and the limited partnership, South Meadows Properties Limited Partnership (South Meadows). Together, they planned to develop commercial and industrial office space in Reno, Nevada on an approximately 2425-acre parcel of land called the Double Diamond Ranch (Ranch). Prior to this time, the Ranch was used for ranching and agricultural activities for nearly eighty years. Because the area where the Ranch was located received an annual average of only 7.14 inches of natural rainfall, the Ranch was irrigated by its previous owners with nearly six acre-feet of water per year per acre, through a complex system of irrigation ditches that criss-cross the Ranch property, in order to support ranching and agricultural activities.

In 1986, the Ranch was purchased by Southmark Corporation (Southmark), which intended to convert the property from agricultural and ranching usage into a large-scale commercial and residential development. Southmark prepared a detailed and comprehensive master plan for the construction of 7000 residential units, 321 acres of commercial space, and 37 acres of retail shops on the former Ranch property (Master Plan). The Master Plan also called for the construction of roads, schools, churches, fire stations, recreational trails, and parks, etc.—in short, the Master Plan contained all of the elements necessary for the development of a self-contained community.

On January 30, 1987, the Reno City Council (City Council) conditionally approved Southmark's Master Plan and zoning requests by adopting a resolution of intent approval. However the City Council's resolution of intent approval contained forty-one separate and detailed conditions that Southmark was required to satisfy concerning traffic, transportation, permits, etc. Of particular concern to the matter at bar was Condition 15. Condition 15 required that prior to the issuance of any permit by the City of Reno, or the commencement of any site work, Southmark had to submit plans approved by the United States Army Corps of Engineers (Corps) delineating wetlands or any other lands the development of which were subject to the issuance of federal permits.

Wetlands are areas of land that are inundated or saturated by surface or groundwater, with frequency and duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 323.2(c) (1978); 40 C.F.R. § 230.41(a)(1) (2004).[2] Wetlands tend to be marshes, bogs, or tidal areas that serve important ecological functions, including protecting erosion and flood control.

A delineation is a several-step process that the Corps undertakes to determine whether or not an area on a property may be within the jurisdiction of the Corps, including whether an area constitutes a protected wet-

---

2. In 1982, the 1977 regulations were replaced by substantially identical regulations that remain in force today. *See* 33 C.F.R. § 323.2(a)(2) (1982); 33 C.F.R. § 328.2 (2004).

land. The Corps initially decides whether an area is a federally protected wetland, and if a wetland is present, the Corps determines the boundary of that wetland. From an ecological point of view, the Corps looks at whether there exists hydric soil to support hydrophytic vegetation.

Once the wetlands have been identified and mapped, usually a report is prepared with a map showing the wetland boundaries. Once an accurate map is completed, the Corps will a prepare a letter to notify the property owner of the official designation of wetlands on the landowner's property. Areas that are defined as non-wetlands are outside of the Corps' jurisdiction and do not require a permit for building. However, those areas that are mapped as wetlands require a permit to fill the land and for any building.

The Corps has the primary responsibility for processing wetland permits. Section 404 of the Clean Water Act (CWA) forbids the discharge of a pollutant by any person into wetlands, except in accordance with the statutory scheme requiring a permit for such discharge. 33 U.S.C. § 1344. The Corps may issue permits for the "discharge of dredged or fill material into the navigable waters at specified disposal sites." *Id.* § 1344(a).

The Corps had previously contacted Southmark in August 1986 concerning the possible existence of wetlands on the Ranch that might be impacted by the proposed Master Plan. At that time, the Corps conducted a preliminary assessment of the Ranch property and concluded that there existed approximately 1300 acres of potential wetlands vegetation on the Ranch. Although the Corps' preliminary assessment did not represent a final wetlands determination under the Section 404 regulatory scheme, Southmark disagreed with the Corps' conclusion on the grounds that most of the vegetation on the property was a direct result of years of artificial flood irrigation. Consequently, on March 16, 1987, Southmark suspended all artificial irrigation of the Ranch in an effort to ensure

that the Corps could evaluate hydrogeological conditions in the Ranch under normal circumstances when it did ultimately prepare its final wetlands determination.

In the spring of 1988, the Normans became interested in purchasing a 470–acre commercial portion of the Ranch for development as an industrial park, per the Master Plan. They were unwilling, however, to purchase the 470–acre commercial portion until the Corps completed a final wetlands delineation of the property.

## 2. The 1988 Wetlands Delineation

Thus, in June 1988, a team of wetlands experts from the Corps was sent to the Ranch to conduct field work necessary to prepare a final wetlands delineation. The delineation team visited the Ranch for one week and gathered data from thirty-two sites throughout the Ranch to determine what portions of the Ranch property, if any, exhibited the characteristics necessary to classify that land as jurisdictional wetlands.[3] Using field data gathered by the delineation team, on September 12, 1988, the Corps issued a delineation, which was prepared pursuant to the 1987 version of the Corps' Wetlands Delineation Manual. It concluded that the Ranch property contained twenty-eight acres of jurisdictional wetlands. Seventeen of these acres were located on the 470–acre commercial parcel the Normans were considering purchasing, while the remaining eleven acres were located on the part of the Ranch marked for residential development. The existence of seventeen acres of wetlands on the 470–acre commercial parcel did not interfere with the development planned for the Ranch and easily could have been incorporated into open spaces that already existed under the Master Plan.

Shortly after the Corps issued this 1988 delineation, Southmark sold the Ranch property to two entities, Double Diamond Ranch Limited Partnership (DDR), and G & E General Contractors (G & E). The sale of the Ranch, for a total purchase price of $20 million, was closed on December 30, 1988.

---

**3.** These characteristics are: (1) hydrology, (2) hydric soil, and (3) hydrophytic vegetation. Tr. at 445–46.

The sale was structured so that DDR took title to approximately 1800 acres of the Ranch which had been designated for residential development (Residential portion), while G & E took title to approximately 470 acres of Ranch land that had been designated for commercial, industrial and retail development (Commercial portion). Some acreage was also transferred to the City of Reno and other municipal entities for the building of highways and other improvements. DDR paid $11.6 million for the Residential portion, while G & E paid $8.4 million for the Commercial portion with money provided by the Normans.

Following the sale, on January 9, 1989, G & E and DDR entered into an agreement whereby the two entities agreed to work together to develop the Residential and Commercial portions of the Ranch property (Development Agreement). The Development Agreement was signed by Robert Helms, on behalf of DDR, and by Lance Gilman, president of G & E, on behalf of G & E.[4] Under the Development Agreement, DDR agreed to construct certain offsite improvements such as roads, curbs and gutters, utilities, etc., necessary for the development of the Commercial portion. For its part, G & E agreed to ensure satisfaction of the forty-one development conditions imposed by the City of Reno in its conditional approval of the Master Plan. The Development Agreement also addressed the allocation of water rights between the Commercial and Residential portions. In addition, both parties agreed to meet on a regular basis (at least annually) to discuss traffic mitigation measures. Finally, the parties acknowledged that the development of the Commercial and Residential portions would require the parties' continued cooperation and best efforts. However, beyond this, the Development Agreement left the parties free to develop their respective portions of the project independently.

As of December 30, 1988, the Normans had acquired the Commercial portion through a tax-free exchange with G & E, though title of the Commercial portion was not transferred to the Normans until June 20, 1989.[5] On that date, title was transferred to two trusts—the Don Roger Norman Trust and the Roger William Norman Trust. The Normans later quitclaimed their ownership in the 470–acre Commercial portion to plaintiff South Meadows, a limited partnership which includes the Normans and Lance Gilman. The Normans did not become parties to the 1989 Development Agreement until September 30, 1991, when the Normans and Robert Helms executed a document entitled "Amendment to Development Agreement," which amended the original Development Agreement between DDR and G & E. This amended agreement acknowledged that all obligations, rights, title, and interest in the Commercial portion and in the 1989 Development Agreement had been conveyed to the Normans. The amended agreement, like the original Development Agreement, called for the Normans and Mr. Helms to cooperate in the construction and financing of certain off-site improvements.

The original Ranch property, bought by Southmark, and then later split into the Commercial and Residential portions sold to G & E/South Meadows and DDR/Helms, respectively, can be described in the following manner. The Ranch property is located in an area called Truckee Meadows, which is located in the southeast portion of Reno, Nevada. The 470–acre Commercial portion purchased from G & E by the Normans, and later deeded to South Meadows, lies west of Double R Boulevard, which was previously referred to as the Moana Lane divide. The Commercial portion generally extends to U.S. Highway 395 (also known as Interstate Route 580). The 1800–acre Residential portion lies to the east of Double R Boulevard and extends beyond Double Diamond Parkway up to and beyond Carat Boulevard. Although these roads did not initially exist in 1988, they were later created when the

---

4. At times throughout this opinion, the 1800–acre Residential portion acquired by DDR is also referred to as the "Helms portion" after its owner Robert Helms.

5. In 1989, plaintiffs also purchased neighboring properties, the Winkle and Farahi ranches, for access to the development project and for the Nevada Department of Transportation (NDOT) right-of-way and interchange.

Ranch property was undergoing its development.

Because of the complicated nature of this lawsuit, it is important to identify the location of the wetland parcels delineated by the Corps in 1988 in reference to the Commercial and Residential portions. The seventeen acres of wetlands delineated on the 470–acre Commercial portion of the Ranch, under the Corps' 1988 wetlands determination, were located as follows:

- A 5.34–acre parcel which borders, and is located east of, Highway 395, referenced as wetland 21 (WL 21);
- A 4.38–acre parcel between the Moana Lane divide and Highway 395, referenced as wetlands 19 and 20 (WL 19 and WL 20);
- A 7.64–acre parcel located south of Thomas Creek Channel, referenced as wetland 17A (WL 17A); and
- A sliver of .14 acres of wetlands located near Whites Creek.

Joint Ex. 8, App. C.; Def.'s Ex. 299.

The other eleven acres of wetlands delineated by the Corps in 1988 are located on the 1800–acre Residential portion sold by Southmark to DDR/Helms. These eleven acres are:

- A 4.81–acre parcel located south of Carat Boulevard, referenced as wetland 5 (WL 5);
- A 5.5–acre parcel located north of Double Diamond Parkway and east of the Moana Lane divide, referenced as wetland 22 (WL 22); and
- A small sliver of .47 acres of wetlands located near Double Diamond Parkway, referenced as wetland 1.5 (WL 1.5).

Joint Ex. 8, App. C.; Def.'s Ex. 299.

### 3. The 1991 Redelineation Of Wetlands On The Ranch

In the months following the sale of the Ranch from Southmark to plaintiffs, a storm of controversy arose concerning the Corps' 1988 wetlands delineation. The 1988 delineation was severely criticized by the general public, environmental groups, and even by employees of the Corps and other federal agencies, including the United States Environmental Protection Agency (EPA), and the United States Fish & Wildlife Service (FWS).

Eventually, the Corps revoked the 1988 wetlands delineation and conducted a new delineation under the 1989 version of the Corps' Wetlands Delineation Manual. The Corps informed the Normans, by letter dated October 10, 1990, that the 1988 wetlands delineation of the Ranch was no longer valid and that a new delineation of the Ranch property was required. The Corps' October 10, 1990 letter explained that the 1988 wetlands delineation may have been inaccurate because the delineation team utilized a growing season that was not appropriate for the area where the Ranch was located. Therefore, the Corps informed plaintiffs that the Corps would conduct a new delineation, utilizing the proper growing season for the area.

In April 1991, a delineation team from the Corps returned to the Ranch to collect data for a new wetlands delineation. The delineation team collected data from 108 sites across the Ranch over a week-long period. Using this data, and following the procedures set forth in the 1989 version of the Corps' Wetlands Delineation Manual, the Corps prepared a new delineation of the Ranch property.

Whereas the 1988 wetlands delineation had identified only twenty-eight acres of wetlands on the Ranch (seventeen of which were on the 470–acre Commercial portion purchased by the plaintiffs), the 1991 delineation identified 230 acres of wetlands on the Ranch property. Eighty-seven acres of wetlands, including the original seventeen acres, were now on the Commercial portion, and 143 acres were now on the Residential portion. Whereas the 1988 delineation was based upon an estimated growing season allowed by the 1987 manual, the 1991 redelineation was based upon actual, measured soil temperature, and not an estimated growing season.

Thus, as a result of the new 1991 redelineation of wetlands, in addition to the original seventeen acres, the following areas were

designated by the Corps as wetlands on the Commercial portion:

- A 4.19–acre parcel located adjacent to wetland 17A, referenced as wetland 17B (WL 17B);
- An approximately sixty-acre parcel of wetlands located between Double R Boulevard and Highway 395, referenced as wetland 15 (WL 15); and
- A small grouping of wetlands parcels adjacent to WL 15, referenced as wetlands 8 through 14 (WLs 8–14).

Joint Ex. 19; Def.'s Ex. 299.

Similarly, in addition to the original eleven acres delineated in 1988, the following additional areas were designated by the Corps as wetlands on the Residential portion in 1991:

- An approximately 115–acre parcel located adjacent to, and east of, WL 15, referenced as wetland 16 (WL16);
- A parcel located along the North Channel, referenced as wetland 1 (WL 1);
- Small parcels of wetlands located around Whites Creek Channel, referenced as wetlands 2, 3 and 4 (WLs 2–4);
- A parcel located south of, and adjacent to, WL 5, referenced as wetland 6 (WL 6); and
- A parcel located south of WL 16 and east of WLs 8–12, referenced as wetland 7 (WL 7).

Joint Ex. 19; Def.'s Ex. 299.

The effect of the 1991 redelineation is at the heart the dispute adjudicated at trial. Plaintiffs put forth evidence attempting to prove that the Corps' rescission of the 1988 delineation was fatal to plaintiffs' and Helms' efforts to carry out Southmark's original Master Plan for development of the Ranch property. Shortly after the Corps released the 1991 wetlands delineation, plaintiffs claim that they were forced to go back to the drawing board and embark on a new plan to develop the entire Ranch development. According to the testimony of Lance Gilman, real estate broker for the Normans and partner in South Meadows, plaintiffs were forced

into phased development because of the 1991 delineation.

Plaintiffs' new plan was to try to develop the Ranch property in phases. In November 1991, plaintiffs applied to the City of Reno for a master plan amendment and zoning map amendments to develop 210 acres of the Commercial portion as a planned unit development (PUD). According to documents submitted to the City, plaintiffs intended to develop this 210–acre tract, referred to as "South Meadows Planned Development Phase I," to include commercial, industrial, office and multi-family residential components (Phase I). On February 25, 1992, the City Council tentatively approved plaintiffs' plans to proceed with the development of Phase I of the Commercial portion as a PUD.

In 1994, plaintiffs acquired additional, neighboring ranch areas for their development. These properties—the Flindt, Pecetti and Dotta ranches—were developed as Phase II of the new development (Phase II). Combined, these ranches total approximately 130 acres and became part of Phase II of South Meadows' planned development.[6]

In late 1994, plaintiffs began to pursue acquisition and development of the Residential portion of the Ranch, also as a planned unit development. On September 29, 1994, South Meadows purchased the 1800–acre Residential portion from the bankruptcy estate of Robert Helms, for a total purchase price of $30 million. The $30 million purchase price included $2 million cash, plaintiffs' assumption of a $22 million note, and plaintiffs' waiver of a $6 million claim against the Helms' bankruptcy estate.

In November 1994, plaintiffs filed a petition with the City to re-annex the Residential portion of the Ranch and sought a master plan amendment and zoning for a PUD for the Residential portion so that the 1800–acre Residential portion from the Helms' bankruptcy estate could constitute Phase III of the South Meadows development project (Phase III). Mr. Helms had previously de-annexed his 1800–acre estate. In early 1995, plaintiffs received conditional approval from the City of Reno to develop the Residential

---

6. On April 3, 1996, plaintiffs also acquired nearby property from Nevada Bell. On May 15, 1998, plaintiffs acquired a small neighboring property from G & E.

portion as a PUD. The purchase of the Helms property and the re-annexation of that property with the Commercial portion and the surrounding neighboring properties purchased by plaintiffs for Phases I, II and III of plaintiffs' overall planned development, including an October 1999 addition to Phase III, but excluding property conveyed to NDOT for highways and interchanges, created a new 2280.93–acre development property (2280–acre Development).[7]

Subsequent to the purchase of the Helms property, plaintiffs sold off a large portion of the Residential portion in bulk to Double Diamond Ranch LLC (also referred to as Double Diamond Homes (DDH)).[8] Included in the part of the Residential portion sold to DDH were WL 1.5 and WLs 2–7.

#### 4. The 1995 Permit

In January 1995, plaintiffs submitted an application to the Corps for a permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344. In their application, plaintiffs sought approval from the Corps to impact thirteen acres of wetlands, and approximately two acres of "other waters" of the United States, as part of plaintiffs' plan to develop the entire Ranch area for commercial, industrial and residential uses. To mitigate the impact of the proposed development on wetlands and other waters, plaintiffs proposed to create additional wetlands to ensure no net loss of wetlands functions and values. Plaintiffs' mitigation proposal called for the creation of 20.6 acres of replacement wetlands, or approximately 1.37 acres of mitigation for each acre of wetlands impacted. Plaintiffs' application, including the proposed mitigation scheme, was approved by the Corps, and a Section 404 permit was issued to plaintiffs on May 22, 1995 (1995 Permit).

#### 5. The 1999 Permit

On March 27, 1998, South Meadows submitted another application for a Section 404 permit, seeking to impact wetlands on the 2280–acre Development to construct a multi-purpose commercial, industrial and residential development on the property. On January 13, 1999, the Corps informed South Meadows that its project, as proposed, would result in significant environmental impacts and therefore the Corps would have to prepare an Environmental Impact Statement in compliance with the National Environmental Policy Act of 1969, Pub.L. No. 91–190, 83 Stat. 852 (codified in scattered sections of 42 U.S.C. § 4321, *et seq.* (2000) (as amended)). However, the Corps indicated in its letter that providing a mitigation plan which clearly reduced the project impacts to a less than significant level would preclude the need for an Environmental Impact Statement. The Corps enclosed with its letter an environmental assessment which described a project which would be less environmentally damaging—a modified development alternative.

On March 1, 1999, the Corps explained its proposed modified development alternative to plaintiffs, which would allow the Corps to complete the Section 404 permitting process without preparing an Environmental Impact Statement on plaintiffs' application to fill additional wetlands in the 2280–acre Development area. In July 1999, South Meadows, along with DDH, submitted a revised mitigation and monitoring proposal for both the Commercial and Residential portions of the 2280–acre Development.

According to the testimony of Kevin Roukey, a project manager for the Corps, the mitigation proposal was a result of a negotiations process between the Corps and plaintiffs. In particular, the parties discussed which areas of property on the 2280–acre Development could be utilized as mitigation wetlands. According to the testimony of Vince Griffith of Reno Engineering, consultant to the Normans and project engineer to

---

7. The 2280–acre Development does not include the "Farahi" parcel since it was not included in any phase of development. However the Winkle, Dotta, Pecetti, Flindt and Nevada Bell parcels are all part of Phases I and II of the development. In total, the 2280–acre Development consists of Phases I, II and III, including the residential component of property sold to Double Diamond Ranch LLC, *infra*, but excluding property conveyed to the Nevada Department of Transportation for the I–580 right-of-way and the Damonte Parkway interchange. The G & E property purchased in 1998 is not part of the 2280–acre Development.

8. According to Lee Smith, defendant's expert, plaintiffs sold 798 acres to DDH.

the development, the Corps generally proposed the areas which could serve as mitigation wetlands. The Corps determined that the areas designated on the 2280–acre Development for storm drainage could sufficiently serve as a mitigation wetlands due to the hydrology surrounding that area. Over a course of meetings, the parties determined that in exchange for being able to fill existing wetlands, the plaintiffs would maintain the storm drainage system as mitigation wetlands.

In August 1999, this proposal was approved by the Corps. Consequently, on August 31, 1999, the Corps issued plaintiffs and DDH a Section 404 permit. (1999 Permit). This permit incorporated the conditions and requirements in the 1995 Permit and superceded it. The 1999 Permit allowed plaintiffs to:

- Fill 60.24 acres of wetlands (WLs 1, 11.5, 12, 13, 14, 15 and 17A);
- Maintain the 1.32 acres of filled waters permitted under the 1995 permit (WLs 10 and 10. 5); and
- Fill 1.42 acres of waters of the United States.

In summation, under the 1999 Permit, plaintiffs were allowed to impact 61.56 acres of wetlands and 1.42 acres of waters of the United States. In exchange, plaintiffs were required under the 1999 Permit to:

- Create 60.24 acres of wetlands (C–1 water detention basin);
- Create 1.32 acres of waters of the United States (located in the North Channel);
- Preserve and maintain 17.16 acres of existing wetlands (WLs 20, 21, 22 and 17B);
- Restore 115.7 acres of existing wetlands (WL 16); and
- Construct 1.42 acres of other waters of the United States as compensatory mitigation (within the Thomas and Browns creek channels).

Thus, under the 1999 Permit, plaintiffs were required to create, preserve, maintain or restore 194.42 acres of wetlands and 1.42 acres of waters of the United States for a total of 195.84 acres. In addition to these requirements, the 1999 Permit also required plaintiffs to:

- Record[ ] the formation of a Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas.
- Record[ ] deed restrictions maintaining all mitigation preservation areas as wetland preserves and wildlife habitat in perpetuity (Deed of Restrictions).

The Deed of Restrictions, attached to the 1999 Permit, is also a point of contention between the parties. The Deed of Restrictions explicitly prohibits development, stating that "no commercial, industrial, agricultural or residential developments, structures or buildings shall be allowed or permitted in the [p]rotected [a]rea." Def.'s Ex. 31 at 3. The Deed of Restrictions prohibited all development on the wetlands areas, and further prohibited the destruction of vegetation and natural plants in the wetlands area, the plowing or cultivation of any wetlands areas, and required that the wetlands areas be maintained as open space. The 1999 Permit required the plaintiffs to record the Deed of Restrictions maintaining all mitigation preservation areas as wetlands preserves and wildlife habitat "in perpetuity." Joint Ex. 29 ¶ 9(b). In order to comply with the condition requiring a Corps-approved funding mechanism for the long term maintenance of the mitigation and preservation areas, plaintiffs conveyed title to all of the wetlands mitigation acres to a non-profit property owners association. This property association, the South Meadows Association, was approved by the Corps as a funding mechanism for the long-term maintenance of the mitigation and preservation areas required under the 1999 Permit.

The Deed of Restrictions is broader than the 1999 Permit.[9] According to plaintiffs, it

---

9. The government spent considerable time at trial arguing that the Deed of Restrictions is not the governing document in this matter and that the 1999 Permit trumps any requirements in the Deed of Restrictions. The court does not venture into the issue of whether any requirements contained in the Deed of Restrictions supercedes those in the 1999 Permit. For the most part, it is

required plaintiffs to set aside as mitigation wetlands the following:

- 66.45 acres of the C–1 detention basin;
- 24.25 acres of waters of the North Channel;[10]
- 7.76 acres of wetlands of area C–2;
- 6 acres of wetlands of WL 22;
- 2.02 acres of waters of the Thomas Channel;
- 1.314 acres of waters of the Delta Channel;
- 2.53 acres of wetlands of WL 20;
- .632 acres of wetlands of WL 11;
- 115.18 acres of wetlands of WL 16;
- 4.19 acres of wetlands of WL 17B; and
- 4.82 acres of wetlands of WL 21.

Plaintiffs set forth evidence at trial that the recordation of the Deed of Restrictions was required under the 1999 Permit, and furthermore, because of it, 220.85 acres of land were required to be set aside as wetlands. Although the 1999 Permit required only 195.84 acres of mitigation wetlands to be maintained as such, and the Deed of Restrictions required a total of 235.14 acres to be maintained as wetlands, plaintiffs' taking claim is for 220.85 acres of property that was required to be maintained as wetlands under both the 1999 Permit and the Deed of Restrictions when read together as one document.

Plaintiffs achieve the 220.85–acre number in the following way: plaintiffs omitted from their takings claim 14.29 acres of land from the 235.14 acres indicated in the Deed of Restrictions. These 14.29 acres constitute a reduction of 10.38 acres of land from WL 16, a reduction of 1.21 acres of land from WL 20, and a reduction of 2.7 acres of land from various other parcels that had been previously designated as wetlands.[11] Plaintiffs omit-

ted these portions from their takings claim because these areas are those which plaintiffs agree were not taken by the government because plaintiffs used them as drainage areas in order to develop their property. Thus, plaintiffs' overall takings claim of 220.85 acres represents the following areas that plaintiffs claim were required by the Corps to be maintained and designated as wetlands:

- 4.82 acres of WL 21;
- 4.07 acres of WL 17B;
- 104.8 acres of WL 16;
- 1.32 acres of WL 20;
- 1.314 acres of waters of the Delta Channel;
- 2.02 acres of waters of the Thomas Channel;
- 5.5 acres of WL 22;
- 6.82 acres from area C–2;
- 65.94 acres of C–1 detention basin; and
- 24.25 acres of waters of the North Channel.

In summation, the amount of acreage plaintiffs claim to have been taken by the Corps by virtue of the Deed of Restrictions and the 1999 Permit totals 220.85 acres—the areas that the Corps mandated to remain undeveloped by plaintiffs and set aside as mitigation wetlands. As stated above, this acreage was deeded to the South Meadows Association to ensure that the mitigation wetland areas be maintained as wetlands and remain unused and undeveloped by plaintiffs or any other entity. Because of the Corps' requirement that these areas be transferred to a "Corps approved funding mechanism for the long term maintenance of the mitigation and preserve areas," plaintiffs claim damages of $34,233,000 (plus 10% interest), allegedly

unnecessary for the court's analysis of whether a compensable taking has occurred of 220.85 acres of plaintiffs' property. The court is concerned solely with the acreage claimed to have been taken, regardless of which instrument is alleged as the source of the taking.

10. Plaintiffs claim that this acreage was actually required to serve as a flood plain wetland area for the C–1 detention basin as a special condition under the 1999 Permit. However, this particular

area was specifically designated for that purpose in the Deed of Restrictions.

11. These 2.7 acres of land are reduced from plaintiffs' takings claim as follows: .12 acres was subtracted from WL 17B; .632 acres was subtracted from WL 11; .5 acres was subtracted from WL 22; .94 acres was subtracted from area C–2; and .51 acres was subtracted from C–1 detention basin.

the fair market value of this property. Joint Ex. 29 ¶ 9(a).

After the issuance of the 1999 Permit, plaintiffs continued to sell the developable parts of the 2280–acre Development to various independent third parties. From the sale of the developable areas in the Commercial portion, Residential portion and other properties that constituted Phases I, II and III of plaintiffs' entire development project, at the time of the issuance of the 1999 Permit, plaintiffs only retained ownership of 716 acres of property.

## B. Procedural History

This matter has a long and winding history. Plaintiffs commenced this lawsuit on October 5, 1995. In 1996, plaintiffs moved for partial summary judgment solely on the issue of liability and the government cross-moved for summary judgment on the entire case. On August 12, 1997, the trial court issued an opinion granting the government's cross-motion to dismiss plaintiffs' breach of contract claim, granting the government's motion to dismiss the claims of temporary and permanent takings of the residential property, and denying the government's cross-motion for summary judgment on the claims of permanent and temporary takings of the commercial property. *Norman v. United States,* 38 Fed.Cl. 417, 430 (1997).

On January 27, 1999, the case was reassigned to the undersigned. On September 21, 1999, the government moved for summary judgment on the claims of a temporary and permanent taking of the commercial property. On November 9, 1999, plaintiffs filed a cross-motion for summary judgment. On February 26, 2001, over the objection of plaintiffs' counsel on relevancy grounds, the court deferred the resolution of defendant's motion for summary judgment and plaintiffs' cross-motion pending the decision of the United States Supreme Court (Supreme Court) in *Palazzolo v. Rhode Island,* No. 99–2047.

On August 20, 2001, plaintiffs filed a motion for leave to amend their original complaint based, in large part, on the Supreme Court's decision in *Palazzolo v. Rhode Island,* 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001), which was issued on June 28, 2001, as well as the change of circumstances in this case that had occurred since the original complaint was filed in 1995. The proposed amended complaint: (1) eliminated the breach of contract claim on which the trial court granted summary judgment to defendant in 1997; (2) revised the permanent taking claim to allege a right to just compensation for 193.11 acres which plaintiffs were required to dedicate to public use in perpetuity; (3) reinstated plaintiffs' claim for the taking of the Residential portion acquired in 1994 in accordance with the holding in *Palazzolo;* and (4) added a new claim for illegal exaction.

On March 27, 2002, the court issued an order wherein it granted, *inter alia,* plaintiffs' motion for leave to amend original complaint, filed August 20, 2001. Thus, defendant's pending motion for summary judgment and plaintiffs' cross motion for partial summary judgment were rendered moot through the filing of the amended complaint. On April 10, 2002, the government filed its answer to the amended complaint. Subsequently, on May 21, 2002, the court issued an order granting plaintiffs' motion to dismiss with prejudice its temporary takings claim raised in the March 27, 2002 amended complaint.

On February 12, 2003, the government filed: (1) its motion for partial summary judgment and corrected memorandum in support of its motion for partial summary judgment; and (2) its corrected motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case. In March 2003, the court heard oral argument on the government's motion for partial summary judgment and motion *in limine* and plaintiffs' responses thereto.

On April 17, 2003, this court issued an opinion dismissing plaintiffs' illegal exaction claim for lack of subject matter jurisdiction. *Norman v. United States,* 56 Fed.Cl. 255 (2003). In view of this dismissal, defendant's motion for partial summary judgment dated February 12, 2003 and plaintiffs' cross-motion for partial summary judgment

were denied as moot. Furthermore, defendant's motion *in limine* to bar plaintiffs from challenging the validity of the government action that allegedly effected a taking in this case, filed February 12, 2003, was granted in part insofar as it sought to prevent plaintiffs from directly challenging the validity and authorization of the government's actions which formed the basis of plaintiffs' Fifth Amendment takings claim. Trial was set for December 1st through 12th, 2003.

On May 22, 2003, this court issued an order regarding plaintiffs' motion to strike several of defendant's witnesses. As a result of the court's April 17 and May 22, 2003 rulings, on September 16, 2003, the parties submitted Revised Memorandums of Contentions of Fact and Law. On November 3, 2003, plaintiffs then filed a motion *in limine* to exclude the testimony of several of defendant's witnesses.

On November 13, 2004, the parties attended a pretrial conference in this matter. At this time, the court heard oral argument with respect to plaintiffs' November 3, 2003 motion *in limine* to exclude testimony, and defendant's response in opposition thereto. The court also heard oral argument regarding exhibits and witnesses objected to by the parties as set forth in their Revised Memorandum of Contentions of Fact and Law, filed September 16, 2003. During the pretrial conference, plaintiffs withdrew their cause of action that related to the taking by the government of 2446 residential units for public use. Also during the pretrial conference, plaintiffs made an eleventh-hour request to amend their complaint to amend the amount of acreage claimed to have been taken by defendant to 220.85 acres, and to amend any additional damages sought by plaintiffs.

On November 18, 2003, the court granted plaintiffs leave to file a motion to amend their complaint, which plaintiffs filed on November 20, 2003. The court also allowed the parties to introduce evidence of plaintiffs' personal and financial losses from 1988 through the date of the alleged permanent taking in 1999 for the limited purpose of demonstrating or refuting the alleged economic impact of the regulation at issue with regard to the analysis set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). The court also rendered its decision on the admissibility of various witnesses and exhibits for trial.

Consequently, on December 1, 2003, the court granted plaintiffs' motion to retroactively amend their complaint, which plaintiffs submitted on January 5, 2004. Defendant filed a revised answer on January 16, 2004. After trial was held from December 1st through 9th, 2003, on January 15, 2004, per Appendix A, ¶ 19 of the Rules of the United States Court of Federal Claims (RCFC) governing case management procedure, this court ordered the parties to file their post-trial briefs, addressing the parties' contentions, proposed findings of fact, and legal argument.

## II. DISCUSSION

The Takings Clause of the Fifth Amendment commands: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. As explained by the Supreme Court, "[t]he aim of the Clause is to prevent the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *E. Enter. v. Apfel*, 524 U.S. 498, 522, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (citing *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)); *see also Palazzolo v. Rhode Island*, 533 U.S. 606, 618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).

The Federal Circuit has developed a two-part test to evaluate whether a governmental action constitutes a taking of private property without just compensation. *See Maritrans Inc. v. United States*, 342 F.3d 1344, 1351 (Fed.Cir.2003); *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir.2003); *Chancellor Manor v. United States*, 331 F.3d 891, 901–02 (Fed.Cir.2003); *M & J Coal Co. v. United States*, 47 F.3d 1148, 1153–54 (Fed.Cir.1995). Under the first prong of this test, the court must evaluate whether the claimant has a "property

interest" that was affected by the government action. *See Maritrans,* 342 F.3d at 1351; *M & J Coal Co.,* 47 F.3d at 1154. Second, once the court has determined that a property interest exists, it must determine whether a taking has occurred. *Maritrans,* 342 F.3d at 1351.

■ A taking can occur via a physical occupation by the government of one's property, or via a regulation deemed necessary to promote the public interest that so imposes on the owner's property rights that, in essence, it effectuates a taking. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 430, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). The text of the Fifth Amendment provides a basis for distinguishing between physical takings and regulatory takings. *Tahoe–Sierra Preservation Council v. Tahoe Regional Planning Agency,* 535 U.S. 302, 321, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). The plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose, whether the acquisition is a result of a condemnation proceeding or a physical appropriation. *Id.* But the Constitution contains no comparable reference to regulations that prohibit a property owner from making certain uses of his or her property. *Id.* The jurisprudence involving condemnations and physical takings utilizes a straightforward application of *per se* rules. *Id.* However, the regulatory jurisprudence is characterized by the ad hoc factual inquiry propounded in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), which involves an evaluation of all relevant circumstances. The longstanding distinction between acquisitions of property for public use and regulations prohibiting private uses makes it inappropriate to treat cases involving physical takings as controlling precedents for the evaluation of a claim that there has been a regulatory taking. *Tahoe–Sierra,* 535 U.S. at 323, 122 S.Ct. 1465. For the same reason, the court does not ask whether a physical appropriation advances a substantial government interest or whether it deprives the owner of all economically viable use, since the court does not apply precedent from the regulatory takings

realm to the physical takings context. *Id.* In other words, *Penn Central* is inapplicable to permanent physical invasions. *See Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1352–53 (Fed.Cir.2002).

■ With respect to regulatory takings, the threshold inquiry as to the takings issue is "to determine at the onset whether a particular claimed taking was 'categorical' or not." *Rith Energy, Inc. v. United States,* 247 F.3d 1355, 1362 (Fed.Cir.2001). A property owner may show that the government has effectuated a "categorical taking" by demonstrating that a regulation has denied the property owner of "all economically beneficial or productive use of land." *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1015, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992). If a categorical taking is not found, the inquiry does not end there, since in 1978, the Supreme Court set forth a three-part framework for analyzing whether a regulatory taking has occurred based on the ad hoc factual inquiry under *Penn Central. See Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646.

Consequently, plaintiffs advance alternative theories to support their contention that the government took without compensation 220.85 acres of plaintiffs' property when the Corps required that this acreage be set aside and maintained as wetlands "in perpetuity" as a condition for allowing plaintiffs to fill and impact other wetlands areas under the 1999 Permit. First, plaintiffs argue that a physical invasion of property has occurred under *Loretto* and its progeny. Second, plaintiffs argue that under a regulatory takings analysis, a categorical taking of 220.85 acres of plaintiffs' property has occurred in that plaintiffs were denied all economically viable use of their property under *Lucas.* Third, if no categorical taking is found, plaintiffs maintain that a regulatory taking has occurred under the *Penn Central* ad hoc factual inquiry.

## A. Cognizable Property Interest

■ In order for a party to assert a claim for a compensable taking against the government under the Fifth Amendment, the party asserting such a claim must have a cogniza-

ble property interest in property sufficient enough to assert a cause of action. *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed.Cir. 2001) (cognizable property interest is a requirement for asserting an action for a compensable taking under the Fifth Amendment), *cert. denied*, 535 U.S. 1077, 122 S.Ct. 1960, 152 L.Ed.2d 1021 (2002).

■ All real estate property interests are cognizable under the Fifth Amendment. *See Cienega Gardens*, 331 F.3d at 1329. (stating that " '[e]very sort of [real property] interest the citizen may possess' counts as a property interest under the Fifth Amendment") (quoting *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)); *cf. Forest Props., Inc. v. United States*, 39 Fed.Cl. 56, 68–70 (1997) (finding property interest in right to exercise contract). A plaintiff is disqualified from claiming a Fifth Amendment taking only if he or she has no "valid property interest," *Wyatt*, 271 F.3d at 1096, or if he or she is "[w]ithout undisputed ownership" of the property at the time of the takings. *Cavin v. United States*, 956 F.2d 1131, 1134 (Fed.Cir.1992).

There is no question that fee simple ownership of real property constitutes a cognizable property interest. Accordingly, the court finds that plaintiffs' ownership of the 220.85 acres of wetlands claimed to have been taken by virtue of the 1999 Permit and the Deed of Restrictions constitutes a sufficient cognizable property interest for plaintiffs to assert their claim.

The court at this point gives no credence to any potential argument that the transfer of the 220.85 acres of mitigation and preservation wetlands to the South Meadows Association in 1999 deprives plaintiffs of their cognizable property interest. First, defendant does not challenge plaintiffs' property interest in the 220.85 acres of land claimed to have been taken. Second, the government acknowledges that the South Meadows Association is an entity in which all business park owners are members and are charged with the duty and responsibility to maintain all open space and common areas in the project. As a business park owner, Don Roger Norman maintains an ownership percentage in the association. In fact, Mr. Norman is president of the association. Accordingly, even if the government did wish to challenge plaintiffs' property interest on account of plaintiffs' transfer of ownership of the 220.85 acres of property to the South Meadows Association, such a challenge would fail on the basis of the retained ownership plaintiffs possess by virtue of their interest in the South Meadows Association.

## B. Physical Taking

Plaintiffs argue that a permanent, physical occupation of their property occurred in that plaintiffs contend that they no longer have the right to exclude others from the 220.85 acres of land the Corps required be set aside for public use as mitigation wetlands, and because the Normans were required to transfer title to those acres to a non-profit property owners association under the conditions set forth in the 1999 Permit. Defendant counterargues that the Corps did not effectuate a physical taking of plaintiffs' property, but rather, merely imposed restrictions on plaintiffs' use of their land. These restrictions, the government contends, were devised by plaintiffs and their own attorneys, and plaintiffs made a voluntary decision to convey these 220.85 acres of land to South Meadows Association.

■ A physical intrusion by the government has long been considered to be a property restriction of an unusually serious character for the purposes of the Takings Clause. *Loretto*, 458 U.S. at 426, 102 S.Ct. 3164. Property rights in a physical thing have been described as the right to "possess, use and dispose of it." *Id.* at 435, 102 S.Ct. 3164 (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945)). To the extent the government permanently occupies physical property, it effectively destroys each of these rights.[12] *Id.*

---

**12.** The Supreme Court defined the destruction of these interests as follows: (1) possession—"the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space"; (2) use—"the permanent physical occupation of property forever denies the owner any power to control the use of property; he not only cannot

**246**

Thus, in order for the government to effectuate a physical taking of private property, there must be exclusive and permanent occupation by the government that destroys the owner's right to possession, use and disposal of the property. *Id.; see also Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (a physical taking of land occurs when the government itself occupies the property or requires the landowner to submit to physical occupation of its land whether by the government or a third party); *Vaizburd v. United States,* 384 F.3d 1278, 1283 (Fed.Cir.2004) (Corps' deposit of sand on beaches constituted a physical taking of property, but, in that instance, damages were nominal). In other words, a physical taking "gives the government possession of the property, the right to admit and exclude others, and the right to use it for a public purpose." *Tahoe–Sierra,* 535 U.S. at 325 n. 19, 122 S.Ct. 1465. For example, the EPA's building of pollution monitoring wells on land was a permanent, physical occupation of private property, constituting a taking under this traditional physical occupation theory. *See Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991). In *Hendler,* the Federal Circuit noted:

> [T]he concept of physical occupation does not require that in every instance the occupation be exclusive, or continuous and uninterrupted. The evidence before the court was that Government vehicles and equipment entered upon plaintiffs' land from time to time, without permission, for purposes of installing and servicing the various wells. They remained on the land for whatever duration was necessary to conduct their activities, and then left, only to return again when the Government desired.

*Id.* at 1377.

■ In *Loretto,* the Supreme Court recited the traditional rule that a permanent, physical occupation of property is a taking. 458 U.S. at 441, 102 S.Ct. 3164. The *Loretto* court did not, however, question the authority of whether the government had the power to impose appropriate restrictions upon the owner's use of his property. *Id.* In this regard, the Supreme Court specifically differentiated between a physical invasion versus a regulatory encumbrance:

> [O]ur holding today in no way alters the analysis governing the State's power to require landlords to comply with building codes and provide utility connections, mailboxes, smoke detectors, fire extinguishers, and the like in the common area of the building. So long as these regulations do not require the landlord to suffer physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.

*Id.* at 440, 102 S.Ct. 3164 (citing *Penn Central,* 438 U.S. at 104, 98 S.Ct. 2646). Thus, in the instance of a physical occupation of private property, the ad hoc inquiry of *Penn Central* does not apply. *See id.* at 432, 102 S.Ct. 3164 (a permanent, physical invasion of property is a government action of such a unique character that it is a taking without regard to ad hoc factors that the court may consider under *Penn Central's* regulatory takings analysis).

The Supreme Court identified an instructive distinction between a physical occupation versus regulatory imposition in *Loretto* which squarely applies here. The *Loretto* court referenced *United States v. Pewee Coal,* 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951), in which the Supreme Court unanimously held that the government's seizure and direction of operations of a coal mine to prevent a national strike of coal miners constituted a taking. The Supreme Court reasoned that because there had been an "actual taking of possession and control," the taking was as clear as if the government held full title and ownership. *Id.* at 116, 71 S.Ct. 670. In contrast, the *Loretto* court noted that in *United States v. Cen. Eureka Mining Co.,* 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed.2d 1228

---

exclude others, but can make no nonpossessory use of the property"; and (3) disposal—"even though the owner may retain the bare legal right to dispose of the occupied space, ... the permanent occupation of that space ... will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Loretto,* 458 U.S. at 435–36, 102 S.Ct. 3164.

(1958), the Supreme Court found no taking where the government had issued a wartime order requiring nonessential gold mines to cease operations for the purpose of conserving equipment and manpower for use in mines more essential to the war effort. The *Central Eureka* court reasoned that "the [g]overnment did not occupy, use or in any manner take physical possession of the gold mines or of the equipment connected with them." *Id.* at 165–66, 78 S.Ct. 1097. The Supreme Court concluded that the temporary, though severe, restrictions on the use of mines was justified by the exigency of war. *Id.* at 168–69, 78 S.Ct. 1097.

In this instance, the parties stipulate that the combination of the 1999 Permit and Deed of Restrictions required plaintiffs to do the following with respect to the 220.85 acres of land at issue here: (1) record the formation of a Corps-approved funding mechanism for the long term maintenance of the mitigation and preserve areas; (2) record the Deed of Restrictions maintaining all preservation areas as wetland preserves and wildlife habitat in perpetuity; (3) convey title to the wetlands mitigation acres to a non-profit property owners association; (4) not develop the 220.85 acres, forbidding commercial, industrial, agricultural or residential developments, structures or buildings; and (5) not engage in any mowing, burning, dewatering, plowing or cultivation of the wetlands areas, nor engage in any leveling, grading or landscaping within the wetlands areas, nor destroy or remove any natural trees, shrubs or other vegetation that exists upon the wetlands areas. Plaintiffs argue that this combination of restrictions effectively kept plaintiffs from being able to take any action with their land. They maintain that these requirements essentially created a physical occupation of 220.85 acres of plaintiffs' property by the government because the interference foreclosed any ability on plaintiffs' part to exercise their bundle of property rights.

Despite the above restrictions, the court does not find that the government physically occupied 220.85 acres of plaintiffs' property. Although in this instance, the Corps placed a permanent condition on plaintiffs' 220.85 acres of land, by requiring that the wetlands be maintained as such "in perpetuity," the government did not occupy or take physical possession of the lands. Instead, title to plaintiffs' property was transferred from plaintiffs to the South Meadows Association, an entity which plaintiffs control, without property rights ever passing to the government. The term "permanent," in the context of physical occupations, does not mean forever. *Hendler,* 952 F.2d at 1376 (recognizing that a permanent taking can be for a limited term and finding that the government's building of pollution monitoring wells was a physical occupation since wells remained on the property for years and were buried 100 feet deep into plaintiff's land). Whether the taking is for an unexpired or limited term goes to the question of compensation, and not whether a taking has occurred. *Id.* Plaintiffs' emphasis on the requirement that 220.85 acres of their property be maintained as wetlands "in perpetuity" does not lend any more weight to whether a physical taking has occurred here than if plaintiffs had been required to maintain their property as wetlands for a limited term. Plaintiffs confusingly focus on perpetuity language in the 1999 Permit as opposed to whether the government physically occupied the property in question.

It is true that while plaintiffs relinquished their right to control ingress and egress of 220.85 acres of their property, an important right in the bundle of property rights, it was not because the government exerted control over these areas or acted in a way that would indicate to the general public that the government maintained rights as property owners of this land. First, according to the testimony of Vince Griffith, engineering consultant to the Normans, there was no requirement that the mitigation and preservation areas on the property be conveyed to a third party. The requirement was only that a funding mechanism be in place, but not necessarily that property be conveyed to a third party. In fact, the 220.85 acres of wetlands were transferred to South Meadows Association because it was previously anticipated by plaintiffs that this was a "common and reliable means of ensuring the preservation" of the wetlands. Def.'s Ex. 249 at A–10 to A–11. Second, the government was in no

better position than plaintiffs to control the ingress and egress of these 220.85 acres once title was conveyed to the South Meadows Association. The government did not acquire any property rights in the property as a result of the transfer. The government exercised no ownership or possession of the property. In its simplest terms, there is no evidence that the government physically controlled 220.85 acres of plaintiffs' property.

This case is unlike *Kaiser Aetna v. United States*, 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), where the Supreme Court found that the government's forcing of a navigational servitude requiring public access to a pond created a physical taking. In *Kaiser Aetna*, the property owners formed a marina by dredging a shallow lagoon and a connecting outlet into contiguous navigable waters. An exclusive subdivision was then built around the marina. The lagoon had been private property before the development, and the property owners continued to deny access to the public after the development. The government claimed that the property owners were required to open the lagoon to members of the public who might choose to visit by boat, since it was now subject to a "navigational servitude." The Supreme Court held that if the government wished to impose public use—even intermittent public use—of the lagoon upon the property owners, it was required to pay just compensation. There, the Supreme Court emphasized that the servitude took the landowner's right to exclude, "one of the most essential sticks in the bundle of rights that are characterized as property" and that the imposition of the servitude would result in an actual physical invasion of the privately owned marina. *Id.* at 176, 100 S.Ct. 383. Thus, the Supreme Court reasoned, "even if the [g]overnment physically invades only an easement in property, it must nonetheless pay compensation." *Id.* at 180, 100 S.Ct. 383.

In this instance, unlike in *Kaiser Aetna*, the Corps did not impose the physical invasion of plaintiffs' property by the government or any other person or party. Nor was there a continued government presence on the property. Instead, the government simply restricted plaintiffs' use of 220.85 acres of land in exchange for allowing plaintiffs to fill and impact other wetland areas on their property. These restrictions were negotiated by plaintiffs and the Corps and documented in the 1999 Permit. Mere restrictions on the use of property do not constitute a physical invasion under *Loretto*. For example, in *Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1353 (2002), the Federal Circuit upheld this court's determination that a physical taking of property did not occur when a property owner was prevented from excluding spotted owls from its property and was required to allow government agents to enter its property to conduct owl surveys. The Federal Circuit agreed with this court that because there was no continuous governmental presence at the site and the conditions imposed no additional burdens on the property beyond the temporary curtailment of logging inherent in the permitting process itself, that there had been no taking under *Loretto*. *Id.* at 1352.

Likewise, this matter involves the conditions placed upon the issuance of a wetlands permit, which is a classic regulatory taking, and normally does not constitute a physical taking. *See Tahoe–Sierra*, 535 U.S. at 324, 122 S.Ct. 1465 (land use regulations do not fall under the ambit of a "classic" taking where the government directly appropriates private property for its own use, but rather involves a regulatory interference with property rights arising from some public program); *see also Forest Props., Inc. v. United States*, 177 F.3d 1360, 1365 (Fed.Cir.1999) (denial of a Section 404 wetlands permit which merely prevented plaintiff from making particular use of a lake, namely, dredging and filling it and then developing it, is a classic regulatory takings claim); *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1175 (Fed.Cir.1994) (issue of whether Corps' denial of a Section 404 permit, resulting in prohibition against construction on wetlands, "squarely raises a regulatory takings claim").

*Forest Properties*, 177 F.3d at 1360, illustrates this point. There, appellant contended that the Corps' denial of plaintiff's request for a Section 404 permit created a physical taking. Forest Properties was a real estate development company which owned property

adjoining a lake and which had received a twenty-year option from a local water company to purchase lake-bottom land. Forest Properties applied to the Corps for a Section 404 permit to dredge and fill approximately nine acres of land adjoining the lake in conjunction with a residential subdivision that would contain waterfront lots and a marina. At the same time, Forest Properties exercised its option to purchase lake-bottom land from the water district in order to develop that property under the development plan, as well. Subsequently, however, the Corps denied the permit, concluding that the development project could not satisfy Section 404's guidelines, mainly because Forest Properties had not rebutted the presumption that there were available less adverse alternatives. *Id.* at 1363. Forest Properties proceeded with a revised development plan without seeking administrative or judicial review of the permit denial and then filed suit seeking compensation, arguing that the denial of the permit was a taking because it deprived appellant productive use of the lake-bottom land and would result in title to the lake-bottom land reverting to the water district.

The Federal Circuit affirmed this court's finding that the denial of the Section 404 permit under the Clean Water Act constituted a regulatory, not a physical, taking. *Id.* at 1364. Forest Properties argued unsuccessfully that the action was a physical taking because the net effect of the denial was the reversion to the water district of Forest Properties' interest in the lake-bottom property, since the lake bottom would not be excavated and filled within three years after execution of the deed to the property. *Id.* at 1365. However, the Federal Circuit found that this was attributable not to the government's action, but to the prior contractual arrangement between plaintiff and the water district for such a reversion. The government itself had not required plaintiff to give up or submit to the physical occupation of the submerged land. *Id.* Because Forest Properties had yet to deed its interest in the lake-bottom property to the water district and continued to retain its title to the submerged land, the court found that no taking claim could arise until the deed transferred to the water district. *Id.* The court then utilized the three-factor *Penn Central* analysis to determine whether the Corps' denial of the permit to dredge and fill the lake-bottom property was a regulatory taking. *Id.* at 1366.

Plaintiffs rely on *Nollan v. California Coastal Commission,* 483 U.S. 825, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987), to support their position that a physical taking has occurred in this instance. The Nollans owned a beachfront lot near a public park. The Nollans originally leased their property with an option to buy, conditioned on the promise to demolish the building residing on the property and replace it. In order to do so, the plaintiffs were required to obtain a coastal development permit from the California Coastal Commission. They submitted a permit application in which they proposed to demolish the existing structure and replace it with a three-bedroom house in keeping with the rest of the neighborhood. The Commission recommended that the permit be granted subject to the condition that they allow a public easement to pass across a portion of their property to ease public traffic from the park to a cove. The Nollans protested this imposition and the Commission overruled their objections. The Commission granted the permit subject to their recordation of a deed restriction granting the easement.

The Nollans filed a petition requesting that the Ventura County Superior Court invalidate the access condition. The request was granted and, on remand, the Commission held a public hearing. The Commission reaffirmed its imposition of the condition, finding that the new house would block the view of the ocean, thus contributing to the development of a "wall of residential structures." *Id.* at 828, 107 S.Ct. 3141. The Commission also found that the effect of constructing the house would "burden the public's ability to traverse to and along the shorefront." *Id.* at 829, 107 S.Ct. 3141. Therefore, the Commission wanted to require the Nollans to offset that burden by providing traditional lateral access to the public beaches in the form of an easement across their property.

The Nollans filed a writ in California Superior Court. The Superior Court ruled in the

Nollans' favor, finding that the imposition of the access condition violated the Takings Clause. However, the California Court of Appeals reversed the decision of the Superior Court. In particular, the Court of Appeals found that the imposition did not deprive the Nollans of all reasonable use of their property. *See Nollan v. Cal. Coastal Comm'n,* 177 Cal.App.3d 719, 223 Cal.Rptr. 28 (1986). The Court of Appeals also found that so long as a project contributed to the need for public access, even if the project standing alone had not created the need for such access, and even if there was only an indirect relationship between the access exacted and the need to which the project contributed, imposition of an access condition on a development permit was sufficiently related to the burdens created by the project to be constitutional. *Id.* at 723–24.

The Nollans appealed to the Supreme Court, arguing that conditioning the issuance of the building permit on the access requirement constituted a taking. The Supreme Court noted that if California had simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access to the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, there would have been a taking. *Nollan,* 483 U.S. at 830, 107 S.Ct. 3141. However, the distinction therein was that the easement was being required to be conveyed as a condition for issuing a land-use permit. The Supreme Court held that a permit condition that serves the same legitimate police-power purpose as a refusal to issue the permit should not be found to be a taking if the refusal to issue the permit would not constitute a taking. *Id.* at 836, 107 S.Ct. 3141. The Supreme Court stated that:

> [I]f the Commission attached to the permit some condition that would have protected the public's ability to see the beach notwithstanding construction of the new house—for example, a height limitation, a width restriction, or a ban on fences—so long as the Commission could have exercised its police power (as we have assumed it could) to forbid construction of the house altogether, imposition of the condition would also be constitutional. Moreover,

> ... the condition would be constitutional even if it consisted of the requirement that the Nollans provide a viewing spot on their property for passersby with whose sighting of the ocean their new house would interfere. Although such a requirement, constituting a permanent grant of continuous access to the property, would have to be considered a taking if it were not attached to a development permit, the Commission's assumed power to forbid construction of the house in order to protect the public's view of the beach, must surely include the power to condition construction upon some concession by the owner, even a concession of property rights, that serves the same end.

*Id.* Based on this reasoning, the Supreme Court continued on to hold that if the nexus between the condition and the original purpose of the building restriction was lacking, then the restriction converts the purpose into something other than it was, that being, impermissibly obtaining an easement to serve some valid government purpose without compensation. The Supreme Court then stated that "unless the permit condition serves the same governmental purpose of the development ban, the building restriction is not a valid regulation, but 'an out-and-out plan of extortion.'" *Id.* at 837, 107 S.Ct. 3141 (citations omitted). The Supreme Court found such a nexus to be lacking and held that the Commission's imposition of the permit condition could not be treated as an exercise of land-use power and reversed the California Court of Appeals' decision. *Id.* at 839, 107 S.Ct. 3141. In particular, the Supreme Court stated that if California wanted an easement across the Nollans' property, they must pay for it. *Id.* at 842, 107 S.Ct. 3141.

Albeit unclearly, plaintiffs rely on *Nollan* to support their position that a physical taking of 220.85 acres of land occurred by the requirement that such land be maintained as mitigation wetlands in exchange for receipt of the 1999 Permit to dredge, fill and develop other wetlands. In *Nollan,* when the California Coastal Commission required the Nollans to grant the public a right-of-access to the beach in exchange for receiving the requested building permit, the *Nollan* court

found such an imposition to be illegal under the Fifth Amendment by virtue of the fact that conditioning the permit on the acceptance of an easement across property, without a nexus to such condition, was no different than if the government had required an easement across the property outright. *Id.* at 837, 107 S.Ct. 3141.

In the case at bar, plaintiffs argue that a similar situation exists with respect to the Normans and South Meadows. They argue that *Nollan* stands for the proposition that where individuals are given a permanent and continuous right to pass to and fro on private land by the government, it constitutes a categorical taking of private property, essentially equivalent to a physical invasion of property. However, the distinction between plaintiffs' argument and *Nollan* is that *Nollan* specifically stands for the proposition that a building permit could not be conditioned on the allowance of an easement across private property when there is no nexus between the access requirement and the land-use regulation. *Id.* at 838–39, 107 S.Ct. 3141. This distinction is important. The absence of a nexus between the harm caused and the condition imposed left the Commission in *Nollan* in the position of simply trying to obtain an easement through gimmickry.

In this instance, the same cannot be said. The issuance of the 1999 Permit, based on the requirement that plaintiffs set aside mitigation and preservation wetlands in exchange for the opportunity to fill and dredge other wetlands, epitomizes the connection that was lacking in *Nollan.* The public interest served by requiring the preservation of wetlands in exchange for the filling and dredging of other lands relates directly to the condition imposed. There is no disconnect. It is clear that the situation at bar is not a physical taking as enunciated by *Nollan,* but rather, fits within the framework of allegations which might support a classic regulatory takings claim.

Plaintiffs also erroneously rely on *Mannatt v. United States,* 48 Fed.Cl. 148 (2000), to support their position that a physical taking occurred. In *Mannatt,* plaintiffs claimed that the United States Bureau of Land Management improperly conducted a resurvey of their lands, resulting in a taking of their property by inverse condemnation. Plaintiffs owned land adjacent to an Indian reservation. A boundary dispute ensued when the individual in possession of the reservation lands moved the fence between plaintiffs' property and the reservation. The Bureau of Land Management claimed that the area in dispute was public land of the United States held in trust for the reservation.

The court in *Mannatt* spent a significant amount of time discussing the propriety of the resurvey under the Bureau of Land Management's regulations. *Id.* at 155. "Although a survey, standing alone, does not affect title in real property, when the government improperly resurveys lands so as to enlarge its interest in the property, and then effectively takes the property, such resurvey plus the assertion of control of the property will constitute a taking by inverse condemnation." *Id.* (citing *Sioux Tribe of Indians of Lower Brule Reservation, S.D. v. United States,* 161 Ct.Cl. 413, 315 F.2d 378, 379 (1963)). The court held that the resurvey created a sufficient, direct and substantial involvement by the government so as to give rise to jurisdiction over plaintiffs' takings claim, despite the fact that the initial invasion was perpetrated by an individual. *Id.* at 156.

Plaintiffs rely on *Mannatt* to support the proposition that when the government requires a landowner to give up property, based on a mistaken survey, a taking has occurred. However, plaintiffs' interpretation of *Mannatt* is incorrect. The *Mannatt* opinion deals with whether there existed subject matter jurisdiction to entertain plaintiffs' lawsuit. The court found that plaintiffs there had successfully plead a claim for a compensable taking, despite the fact that the resurvey was not a formal adjudication, since the resurvey was not unlawful, but rather merely improper. *Id.* at 154. This, the court found, did not divest the court of its jurisdiction over plaintiffs' claims. *Id.* By relying on *Mannatt,* plaintiffs here merely attempt to re-litigate their illegal exaction claim, which was properly disposed of by this court on April 17, 2003. *See Norman,* 56 Fed.Cl. at 265–67.

Accordingly, the court maintains its finding above that no physical taking has occurred in this matter. Plaintiffs have alleged a classic regulatory taking, which is analyzed in detail below.

## C. Regulatory Taking
### 1. Categorical Taking

Having determined that there has been no physical taking in this matter, the court must now analyze whether a regulatory taking of plaintiffs' 220.85 acres of property occurred when the Corps issued plaintiffs a Section 404 permit under the Clean Water Act to fill and impact wetlands in exchange for designating and maintaining as wetlands 220.85 acres of other lands "in perpetuity." As stated previously, a regulatory taking of private property can be found either under the *per se*, categorical rules set forth in *Lucas*, or by applying the ad hoc factors outlined in *Penn Central*. Plaintiffs first argue that a *per se*, categorical taking of 220.85 acres of their property has occurred because plaintiffs were denied their right to use, or otherwise exercise their property rights in 100% of this acreage by virtue of the 1999 Permit and the Deed of Restrictions setting forth a multitude of restrictions.

In the regulatory takings context, the Supreme Court in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), determined that there could exist a regulatory takings case where the *Penn Central* ad hoc framework would be inapplicable. A *per se*, categorical taking could be found if the regulation at issue left the property owners with absolutely no economically viable use of their property. *Id.* at 1017, 112 S.Ct. 2886. The rationale behind such a finding is that when there exists a total deprivation of beneficial use, it is essentially the equivalent of a physical taking. *Id.*

*Lucas* endorsed and applied this categorical rule, finding that the property at issue there was rendered valueless when a statute enforcing a coastal-zone construction ban, created two years after Lucas had begun development of his beachfront property, thwarted Lucas' ability to complete residential development. *Id.* at 1009, 112 S.Ct. 2886.

Because the property at issue was obtained when such activity was permissible under relevant property and nuisance principles, the removal of all economically viable use of the land by the ban on coastal-zone construction effectuated a categorical taking. *Id.* at 1030–31, 112 S.Ct. 2886. The Supreme Court applied a categorical rule that required compensation, but the holding was specifically limited to "the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017, 112 S.Ct. 2886 (emphasis in the original).

The emphasis on the word "no" in the text of *Lucas* was reiterated in a footnote explaining that the categorical rule would not apply if the diminution in value were 95% instead of 100%. *Id.* at 1019 n. 8, 112 S.Ct. 2886. Anything less than a complete elimination of value, or a total loss, would require the kind of analysis applied in *Penn Central*. *Id.* In other words, to prove a "categorical" takings claim, a property owner must demonstrate that a regulatory action resulted in a "total wipeout" of economic value. *See Palm Beach Isles Assocs. v. United States*, 208 F.3d 1374, 1380 (Fed.Cir.2000), *aff'd on reh'g*, 231 F.3d 1354 (Fed.Cir.2000). If the regulation does not result in a 100% diminution in value, then the claim must be analyzed under the fact-specific factors set forth in *Penn Central*. *See Tahoe–Sierra*, 535 U.S. at 330, 122 S.Ct. 1465.

The test for determining whether there has been a categorical taking of property requires the court "to compare the value that has been taken from the property with the value that remains in the property." *Forest Props.*, 177 F.3d at 1365 (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987)). One of the critical questions is determining how to define the unit of property for this assessment. *See id.* This has been referred to in a regulatory takings context as the "parcel as a whole" issue or the issue of determining what constitutes the "relevant parcel." Determining accurately what constitutes the relevant parcel whose value was allegedly lost due to the imposition of a regulation is vital. Without

determining the extent of the property to be analyzed, an accurate calculation of the value lost in the property because of the taking could be jeopardized. The court in *Penn Central* recognized this danger, stating that in order to determine "whether a particular governmental action has effected a taking, the [c]ourt must focus on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ...." 438 U.S. at 130–31, 98 S.Ct. 2646.

■ Plaintiffs argue that the only area of land that should be included in the "relevant parcel" calculation is the 220.85 acres of lands that were required under the 1999 Permit and Deed of Restrictions to be maintained and designated as wetlands in exchange for allowing plaintiffs to fill and dredge other areas on the Residential and Commercial portions. Accordingly, plaintiffs argue that a prohibition of the right to exclude others from this 220.85 acres of property and the loss of the right to dredge and impact this property constitutes a 100% devaluation of this acreage.

There is no rigid formula for determining the appropriate parcel in regulatory takings cases. *Tahoe-Sierra,* 535 U.S. at 326, 122 S.Ct. 1465. Cases in the Federal Circuit and this court lend guidance in determining what should constitute the relevant parcel here. For example, in *Forest Properties,* appellant sought a permit to fill a portion of approximately nine acres of wetlands on a parcel, but was denied the permit. 177 F.3d at 1363. The Federal Circuit, affirming the decision of this court, found that there was no taking because the rest of the parcel had value when one looked at the whole area to be developed, which was the entire sixty-two-acre parcel, including fifty-three acres of uplands purchased by plaintiff in 1988 and an additional 9.4 acres of adjacent lake-bottom wetlands that Forest Properties later acquired. The Federal Circuit agreed that the full sixty-two acres should be treated as the "relevant" parcel since the two parcels were "treated as a single integrated project" and found that the plaintiff intended to use the separate parcels as "one income-producing unit." *Id.* at 1365. In rejecting Forest

Properties' assertion that the parcels should be treated separately because they were acquired at different times and because the two segments were capable of separate development, the Federal Circuit emphasized that the trial court had "properly looked to the economic realities of the arrangements, which transcended these legalistic bright lines." *Id.* at 1366. This was the case even though while the permit was pending, a portion of the parcel had been sold off. The Federal Circuit found that because the parties had acquired the sixty-two acre parcel with the intent of developing it as an entire project, the wetlands themselves could not constitute the relevant parcel. *Id.* at 1365. The scenario presented in *Forest Properties* mimics the facts herein. Though plaintiffs purchased the Residential and Commercial portions at different times, and despite the fact that plaintiffs had sold off part of the Residential portion to DDH prior to the date of the taking, the 2280-acre Development was to be developed as part of an overall single scheme.

In *Tabb Lakes, Inc. v. United States,* 26 Cl.Ct. 1334 (1992), *aff'd,* 10 F.3d 796 (Fed. Cir.1993), the Claims Court rejected plaintiff's attempt to sever its property into five distinct units in order to assert a categorical taking of three units. It also expressly rejected plaintiff's attempt to gerrymander the date of the alleged taking to exclude economic activity which occurred prior to and after the alleged taking period. *Id.* at 1356–57. The Claims Court specifically stated that "[a]llowing plaintiff to artificially segment the planning, acquisition, financing, development, and sales of lots within that Subdivision into but a fraction of the 'whole' cannot be supported ...." *Id.* at 1357. On appeal, the Federal Circuit noted that "[c]learly the quantum of land to be considered is not each individual lot containing wetlands or even the combined area of wetlands. If that were true, the Corps' protection of wetlands via the permit system would, *ipso facto,* constitute a taking in every case where it exercises its statutory authority." 10 F.3d at 802. However, the Federal Circuit did not resolve the issue as to which area should be analyzed, relying on the Claims Court determination that an analysis of the economic im-

254

pact of both parties' proposals as to what constitutes the relevant parcel revealed that plaintiff maintained sizable economic use of both proposed relevant parcels regardless. *Id.*

In *Walcek v. United States,* 303 F.3d 1349 (Fed.Cir.2002), the Federal Circuit reaffirmed the parcel as a whole rule. There, plaintiffs owned 14.5 acres of real property which had been purchased in two transactions in 1971, shortly before the passage of the Clean Water Act in 1972. Plaintiffs purchased the land with the intent of developing it. At the time of the purchase, the property had been zoned for residential purposes. Additionally, somewhere between 4.5 and 5.2 acres of the property had been mapped as wetlands by the State of Delaware. In order to fill this area, the plaintiffs were required to seek approval under Delaware's wetlands act. A third portion of the land was subject to Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403 (2000). In 1972, shortly after plaintiffs had purchased the property, 13.2 acres of it became subject to regulation under Section 404 of the Clean Water Act as federally regulated wetlands. The Walceks were then required to obtain a Section 404 permit to fill and develop the protected wetlands. After an unsuccessful attempt to sell the property, the Walceks began filling and developing the land without obtaining the required federal and state permits. When the Corps became aware of these activities, it issued a cease and desist order, with which the Walceks eventually complied. In 1988, the Walceks applied for Section 404 permits to fill and develop their land, but were denied approval for their development plans by the Corps. The Corps proposed other alternatives, but the Walceks believed them to be economically unviable. The Walceks sued, alleging that a categorical taking had occurred because the denial of the Section 404 permits rendered their property 100% useless. After the Walceks filed their complaint, the Corps issued a Section 404 permit allowing the plaintiffs to fill 2.2 acres of wetlands, conditioned upon creating or

restoring 4.4 acres of other wetlands. At trial, the Court of Federal Claims found that no categorical taking of plaintiffs' land had occurred because the permit did not deny all economically beneficial or productive use of the land when it allowed 2.2 acres of the wetlands to be developed. *Walcek v. United States,* 49 Fed.Cl. 248, 271 (2001). Under the *Penn Central* analysis, the trial court concluded that the application of wetlands regulations via the issuance of a permit to fill 2.2 acres of wetlands effected no compensable taking. *Id.* at 272. Rather, the court noted, it merely caused a noncompensable diminution in value. *Id.*

On appeal, the Walceks argued that the relevant parcel to consider for the takings analysis was the eleven acres of wetlands the permit required the Walceks to leave undeveloped. The Walceks based their argument on *Palazzolo,* where the Supreme Court expressed some discomfort with the rule of regulatory takings that the extent of deprivation should be measured against the parcel as a whole. *Walcek,* 303 F.3d at 1355 (citing *Palazzolo,* 533 U.S. at 631–32, 121 S.Ct. 2448). But the *Walcek* court recognized and noted that the Supreme Court in *Palazzolo* never actually departed from the "parcel as a whole" analysis. *See id.* at 1355.[13] This court will not venture to diverge from the parcel as a whole analysis either.

In *Ciampitti v. United States,* 22 Cl.Ct. 310, 318 (1991), the Claims Court listed the factors to be analyzed in determining the relevant parcel or parcel as a whole, and these factors are instructive to this court in making its relevant parcel determination. The factors are: (1) the degree of continuity, (2) the dates of acquisition, (3) the extent to which the parcel has been treated as a single unit, and (4) the extent to which protected lands increase the value of remaining lands. *Id.* In *Ciampitti,* the owner bought a series of lots in a set of purchases. Purchases 3 through 7 included lots wholly or partially within state and federal wetlands. Despite the existence of wetlands, plaintiff decided to

**13.** The Federal Circuit in *Walcek* never addressed the issue of whether there would have been a categorical taking of property if the relevant parcel had been the remaining eleven acres

of wetlands. 303 F.3d at 1355. Because the Walceks did not raise that argument at trial, they were prohibited from doing so on appeal. *Id.*

continue with his development operations. Consequently, the Corps issued a formal cease and desist order. Plaintiff then decided to apply for a Section 404 permit to maintain the existing unauthorized fill and to place fill in other areas. However, the Corps denied the permit and Ciampitti sued.

Of paramount importance for the *Ciampitti* court was defining the "parcel as a whole." *Id.* at 318. Ciampitti contended that the relevant parcel consisted of only those lots for which a federal permit was sought, comprising fourteen acres of federal wetlands. *Id.* at 319. But the court determined that the parcel as a whole should include "not only those areas as to which dredge and fill permits were denied, but also those areas that had been successfully developed earlier." *Id.* at 320. The court reasoned that even though the lots within purchase 7 were not contiguous, the "parcel as a whole" had to include all of purchase 7, since all of the lots therein were treated as a single parcel for purposes of financing and ownership. *Id.* Ciampitti was forced to purchase and mortgage the land as a package. *Id.; see also Cane Tenn., Inc. v. United States,* 57 Fed.Cl. 115, 121–22 (2003) (analyzing the same factors for determining the relevant parcel and finding that plaintiff treated all tracts purchased as one entity since there was no separate financing for the different tracts and no plan to develop tracts independently).

Plaintiffs rely on *Loveladies Harbor, Inc. v. United States,* 28 F.3d 1171 (Fed.Cir.1994), to support their argument that the relevant parcel in this matter is simply the 220.85 acres to be maintained and dedicated as wetlands under the 1999 Permit. In *Loveladies,* plaintiff owned a 250–acre parcel. Plaintiff developed 199 acres prior to the passage of the Clean Water Act and later applied for a permit to fill the remaining fifty acres (one acre had already been filled). Plaintiff was denied a Section 404 permit for developing the 12.5 acres of wetlands that existed on the area. After plaintiff sued, claiming a taking, the government claimed that the relevant parcel was the entire 250–acre tract, not the 12.5 acres that plaintiff claimed had been taken. However, the court agreed that the 199 acres already developed before the pas-

sage of the Clean Water Act should not be considered in the denominator for calculating whether a categorical taking had occurred and also that the 38.5 acres no longer owned by plaintiff (they had been transferred to the State of New Jersey in exchange for a New Jersey Department of Environmental Protection permit) were properly excluded from the relevant parcel determination. *Id.* at 1181–82. The Federal Circuit stated that:

> This is only logical since whatever substantial value that land had now belongs to the state and not to Loveladies. It would seem ungrateful in the extreme to require Loveladies to convey to the public the rights in the 38.5 acres in exchange for the right to develop 12.5 acres, and then to include the value of the grant as a charge against the givers.

*Id.* at 1181. Thus, the only acres the Federal Circuit considered in determining whether a categorical taking had occurred were the 12.5 acres of wetlands, which was the area covered by the permit, since the remaining acreage was either already developed or was required by the state to remain as wetlands. *Id.* at 1182.

Plaintiffs also rely on *Palm Beach Isles Associates. v. United States,* 208 F.3d 1374 (Fed.Cir.2000), in support of their position. There, a group of investors bought 311.7 acres of land in 1957. A road split the property into two parcels, one parcel constituting 261 acres of upland oceanfront property and the other parcel constituting 50.7 acres of submerged land and shoreline wetlands. When the plaintiffs were denied permits to fill the 50.7–acre parcel, they sued, asserting a taking. The Federal Circuit rejected the government's argument that since the two parcels were purchased together, they must be treated as a single parcel for purposes of the takings suit. *Id.* at 1380–81. The Federal Circuit found that plaintiffs never planned to develop the total 311.7 acres as a single unit. Development plans for 261 acres were separate and unconnected to the 50.7 acres of wetlands. The Federal Circuit reasoned that "[c]ombining the two tracts for purposes of the regulatory takings analysis, simply because at one time they were under common ownership, or because one of the

tracts sold for a substantial price, cannot be justified." *Id.* at 1381. Like in *Loveladies,* in *Palm Beach Isles,* the 261–acre parcel was also bought and sold before the passage of the Clean Water Act. The Federal Circuit found that a categorical taking had occurred, because the relevant parcel, the 50.7 acres of wetlands, had lost 100% of its value when those wetlands could not be dredged and impacted. *Id.*

The court in *Appolo Fuels, Inc. v. United States,* however, distinguished the facts therein from *Loveladies* in the same manner that this court distinguishes the facts in this case from *Loveladies.* 54 Fed.Cl. 717 (2002), *aff'd,* 381 F.3d 1338 (Fed.Cir.2004). Appolo Fuels engaged in the business of mining and selling coal. Consequently, it was subject to the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201–1328 (2000) (SMCRA), which required organizations to obtain a permit from the appropriate state regulatory authority before engaging in surface coal mining operations. *Id.* § 1256. In 1989, Appolo Fuels acquired certain mining rights and began mining under Lease 5A. Appolo Fuels applied for a permit with the local regulatory authority in Tennessee to mine 214 acres within the Yellow Creek watershed. Around that time, the City of Middlesboro and the National Parks Conservation Association filed a petition to have 50% of the watershed designated as unmineable. However, 100% of the area was designated as unsuitable for surface coal mining and operations.

Appolo Fuels obtained additional leases that granted mining rights both within and outside the petition area and then filed suit in this court alleging, *inter alia,* that a permanent regulatory taking of its coal mining interests had occurred. With respect to the relevant parcel issue, Appolo Fuels argued that the appropriate parcel for analysis consisted of the surface mineable coal reserves held by Appolo Fuels within the watershed. 54 Fed.Cl. at 714. The government, on the other hand, argued that the relevant parcel should consist of all of Appolo Fuels' coal interests—those in the petition area *and* those in the surrounding areas. *Id.* Appolo

Fuels relied on *Loveladies* to argue in favor of its choice of denominator.

The *Appolo Fuels* court specifically noted that in *Loveladies,* the parcel had been partially developed prior to the regulatory scheme taking effect. *Id.* at 727. "The relevant parcel in *Loveladies* coincided with the area covered by the permit only because the remainder of plaintiff's property was either developed before the imposition of the federal regulatory scheme or was required by the state to remain undeveloped wetlands." *Id.* In *Appolo Fuels,* however, the court noted that there, Appolo Fuels acquired Lease 5A in 1986 and the other leases over a 10–year period. *Id.* SMCRA was passed in 1977, and, thus, the court was not presented with a *Loveladies* situation where the plaintiff's expectations were formed before the imposition of a regulatory framework. *Id.* Because plaintiff in *Appolo Fuels* had not presented evidence that it considered the petition area distinct from the other leaseholds, the court included in the relevant parcel determination *all* of Appolo Fuels' leasehold interests acquired over the years, less those interests not subject to the petition, due to plaintiff's intent to mine the areas as part of one overall plan. *Id.* at 729–30.

The distinction noted in *Appolo Fuels* regarding *Loveladies* (and, by extension, *Palm Beach Isles*) is applicable here as well. All the parcels purchased by the Normans and South Meadows were acquired after the enactment of the Clean Water Act. Thus, there is no basis to segment certain parcels of wetlands from the parcel as a whole calculation based on *Loveladies* and *Palm Beach Isles.* The reasoning is that, in those two cases, land was purchased before the regulatory scheme was enacted. Here, all parcels purchased by the Normans and South Meadows were acquired after the enactment of the Clean Water Act's permitting process.

The timing of the implementation of the applicable regulatory scheme when calculating the relevant parcel has a great effect on the result of that calculation. This is demonstrated clearly in *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1192–93 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). There, plaintiff

purchased a 10,000–acre property that was divided into five construction or permit areas to be built consecutively, with each stage to take three to four years to complete. While partitioned, however, the community would be a thoroughly integrated, unified whole. Plaintiff sought permits to fill and dredge these areas. In 1964, plaintiff sought a permit to fill and dredge part of the property in the Marco Island area, which was granted by the Corps per Section 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403. In plaintiff's second construction area, Roberts Bay, plaintiff obtained a dredge and fill permit. However, for plaintiff's third, fourth and fifth construction areas, Collier Bay, Barfield Bay and Big Key, respectively, plaintiff became subject to the regulations for acquiring a permit under the newly enacted FWPCA and were denied Section 404 permits. The Court of Claims found that in 1964, when the regulatory jurisdiction of the Corps was limited to "navigable waters of the United States," Deltona routinely was granted the permits for which it applied. However, by 1976, the scope of the Corps' jurisdiction dramatically changed, extending to all "navigable waters" and the criteria for granting permits had stiffened. Deltona argued that it was deprived of all economically viable use of its land. The Court of Claims considered as part of the "parcel as a whole" not only those areas as to which dredge and fill permits had been denied, but also the areas for which permits had previously been issued for development. 657 F.2d at 1192. The Court of Claims bypassed the question of what constituted the relevant parcel because, it reasoned, even if the court were only to consider the three areas for which permits were denied, while Deltona had been blocked from developing Barfield Bay and Big Key, it eventually obtained all the necessary clearances for Collier Bay. Thus, the Court of Claims concluded that Deltona had not been denied all economically viable use of the 10,000–acre property. *Id.* Deltona's "remaining land uses are plentiful and its residual economic position very great. Reduced to its essentials, this case merely represents an instance of some diminution in value." *Id.* at 1192–93.

The Normans and South Meadows argue that the only areas of land that should be included in the "relevant parcel" are the 220.85 acres of lands that were required under the 1999 Permit and Deed of Restrictions to be maintained and designated as wetlands in exchange for allowing plaintiffs to fill and dredge other areas on the Residential and Commercial portions. This is a natural argument for plaintiffs to make. The court said it best in *Walcek,* 49 Fed.Cl. at 259, when it held the following with respect to determining the relevant parcel:

> To the extent the property captured ... includes only wetlands, the impact of the regulation in diminishing the value ... is more pronounced, and thus more indicative of a taking, than if the [property captured] were to include not only the wetlands but also the uplands and other property restricted by the regulation. Given this, it should come as little surprise that defendant argues that the [p]roperty in its entirety, constitutes [the] "parcel as a whole," while plaintiffs assert that only the wetlands portion of the [p]roperty, for which the permit application was actually submitted, should be considered.

*Id.* If the "relevant parcel" constitutes only the 220.85 acres of lands set aside as mitigation and preservation wetlands, then, accordingly, plaintiffs argue, there has been a denial of 100% of the economic value of these 220.85 acres because plaintiffs are precluded from asserting any property rights on this acreage.

Plaintiffs' argument is contradictory and too simplistic. For there to be a 100% diminution of value in this matter, then the relevant parcel would have to be the 220.85 acres claimed to have been taken. This cannot be. These acres are located on various pieces of land purchased by plaintiffs throughout the 2280–acre Development. Some of the 220.85 acres are on the Residential portion, while the remainder are on the Commercial portion. These 220.85 acres cannot be viewed in isolation considering that they were part of a broader permitting scheme for the Residential and Commercial portions. The three phases of the development are interconnecting. The water, sewer, and utility structures

were all designed as an integrated unit. It only makes sense that the relevant parcel constitutes not only the 220.85 acres claimed to have been taken, but also the larger areas on which these lands are located. To parse out the 220.85 acres of mitigation and preservation wetlands is to ignore the fact that the 1999 Permit was issued with respect to the entire 2280–acre area. In fact, plaintiffs' application for the 1999 Permit was filed jointly with DDH, the adjoining property owner. The 1999 Permit allowed the filling and dredging of 61.56 acres of wetlands and 1.42 acres of waters of the United States on both the Commercial and Residential portions in exchange for maintaining mitigation and preservation wetlands throughout the Ranch area. In their application for the 1995 Permit, plaintiffs described their project as consisting of approximately 2288 total acres in aerial extent. The court cannot ignore the fact that the 1999 Permit was part of a broader development scheme encompassing Phases I, II and III of the 2280–acre Development.

Even assuming, *arguendo,* that the relevant parcel here is only the 220.85 acres claimed to have been taken, there has not been a loss of 100% of the land's economic value. The evidence reflects that these 220.85 acres continue to serve as part of plaintiffs' flood control and flood detention facilities with respect to the 2280–acre Development, and have been incorporated into open space requirements, parks, and biking paths. For example, the 2280–acre Development advertised that Phase III of the development would contain 390 acres of open space, trails programs and parks.

In addition, the area designated as the C–1 detention basin serves as a detention basin and drainage facility for the 2280–acre Development (approximately sixty-five acres for the detention basin, plus another twenty-five acres of drainage). Trial testimony showed that the detention basin and drainage channels were necessary for the development of the area. The case law clearly states that if there is no destruction of *all* use, then there is no categorical taking. *See Cooley v. United States,* 324 F.3d 1297, 1305 (Fed.Cir.2003) (holding that a 98.8% decrease in economic

value because a Section 404 wetland fill permit was denied does not constitute a categorical taking). The Federal Circuit specifically stated that "[t]aking away a property's most beneficial use does not by itself constitute a compensable taking . . . . [T]he destruction of one 'strand' of the bundle [of property rights] is not a taking. Only where Congress takes away every beneficial use does a categorical taking occur." *Maritrans Inc. v. United States,* 342 F.3d 1344, 1354 (Fed.Cir.2003). Thus in *Maritrans,* the Federal Circuit found no categorical taking of property where a statute merely limited plaintiff's use of its single hull tank barges and did not necessarily deprive plaintiff of 100% of the beneficial uses of its barges, since plaintiff used and received income from its barges from its shipping operations and because it was able to recoup some of its original investment. *Id.* Here, it is clear that at least a portion of the 220.85 acres of land served a valuable and necessary benefit to the 2280–acre Development. Thus, no categorical taking has occurred with respect to plaintiffs' proposed relevant parcel.

Plaintiffs alternatively argue that the relevant parcel is the original 470–acre Commercial portion that plaintiffs purchased in 1988. Plaintiffs argue that this is the case because had the Corps maintained its original 1988 wetlands determination, plaintiffs would never have needed to purchase the Residential portion and the other ranches (Flindt, Dotta, Pecetti, etc.) because their intent from the onset was only to develop the Commercial Portion. Plaintiffs state that they made these subsequent purchases in an attempt to mitigate the damage inflicted when the Corps retracted its 1988 delineation and invoked the stricter 1991 wetlands delineation. However, even if the relevant parcel at issue here is considered to be the original 470–acre Commercial portion purchased in 1988, it remains impossible for the court to find a 100% loss of all economically viable use of this 470–acre property, since after the issuance of the 1999 Permit (which allowed plaintiffs to fill 60.24 acres of the Commercial Portion), all but 11.54 acres of wetlands and approximately three acres of waters were developed by plaintiffs. The 470–acre parcel was over 90% developable after the issuance

of the 1999 Permit. Additionally, looking back to 1988, Southmark's original master plan for development encompassed the seventeen acres of wetlands designated on the Commercial portion into the design of the development project, making them usable for landscaping and other non-distributing uses allowed under the CWA. This fact would further preclude a categorical taking of property since there was no denial of all economically viable use of the 470–acre parcel. *Lucas*, 505 U.S. at 1018, 112 S.Ct. 2886.

Even more importantly, plaintiffs' argument that the relevant parcel could consist of only the 470–acre Commercial portion is illogical. The 220.85 acres of land claimed to have been taken lie on *both* the 470–acre Commercial portion and the 1800–acre Residential portion purchased by plaintiffs in 1994. For plaintiffs to claim that the only parcel to be analyzed in terms of whether plaintiffs have suffered a decrease in economic value of their property is the 470–acre Commercial portion, when over 200 acres of the 220.85 acres claimed to have been taken physically lie on the Residential portion, is baseless and completely illogical. If plaintiffs were only claiming a taking of the approximately eleven acres to be maintained as wetlands on the 470–acre Commercial portion, then perhaps the relevant parcel might be the 470–acre parcel acquired in 1988. But the court does not make that determination here, for plaintiffs are claiming a taking of 220.85 acres of property, which are mainly located on the 1800–acre Residential portion.

The question becomes, then, for the purposes of the *Penn Central* ad hoc analysis that follows in this opinion, what is the relevant parcel? As stated above, plaintiffs argue that the relevant parcel at issue here is only the 470–acre Commercial portion. In support of this contention, plaintiffs introduced evidence at trial that had the 1988 delineation remained intact, plaintiffs never would have purchased neighboring properties, nor would they have revised the original Southmark Master Development Plan. This contention is supported by the fact that plaintiffs are commercial developers, not residential developers. Lance Gilman testified that the only reason that plaintiffs purchased

the 1800–acre Residential portion from the Helms' bankruptcy estate was because of the 1991 re-delineation. In essence, plaintiffs argue that the re-delineation rendered plaintiffs unable to develop their property according to the original development plan, and therefore, the only way for the development to be profitable was for plaintiffs to acquire additional land. Their argument went on to contend that this was particularly the case since plaintiffs also feared that the bankrupt Helms portion would be bought by competitors who would not develop the property in conjunction with plaintiffs' plans.

Contrary to plaintiffs' argument, looking at the factors identified in *Ciampitti*, it is clear that the relevant parcel at issue here is not merely the 470–acre Commercial portion. The "degree of continuity," "dates of acquisition," "extent of which the parcel has been treated as a single unit," and the "extent protected lands increase the value of remaining lands" show that all the lands encompassed in Phases I, II and III of plaintiffs' development constitute the "parcel as a whole." *Ciampitti*, 22 Cl.Ct. at 318. While plaintiffs' initial intentions in 1988 may have been limited to developing only a portion of Southmark's master plan, with the Residential portion being developed by Robert Helms, from the beginning, plaintiffs and Robert Helms had a joint intention, as outlined in their Development Agreement, that the parcels be developed in a synchronized way. Don Roger Norman testified that plaintiffs and Mr. Helms were to develop their two properties in a non-conflicting manner. Lance Gilman testified that plaintiffs, acting through G & E Contractors, and Mr. Helms, acting through Prime Time Developers, agreed to non-competing uses of their properties. In fact, the Commercial portion was meant to be a part of one fully-functioning community with the Residential portion, as was evidenced in the original Southmark master development plan. The Development Agreement provided that the parties would construct offsite infrastructure necessary to maintain both the commercial and residential developments, such as roads, curbs, gutters and utilities. *Norman*, 38 Fed.Cl. at 420. Furthermore, plaintiffs and Robert Helms sought zoning and master plan changes to-

gether in 1989, soon after the purchase of the 470–acre Commercial portion by the plaintiffs.

At trial, Don Roger Norman and Lance Gilman both adamantly testified that plaintiffs would not have pursued purchase of the Residential portion in 1994, nor other ranches (the Dotta, Flindt, Pecetti, etc.), had the 1988 wetlands delineation remained in force. However, what plaintiffs would or would not have done in 1994, or before then, is speculation and conjecture, since five years before the date of the alleged taking, plaintiffs not only purchased the 1800–acre Residential portion from the bankruptcy estate of Robert Helms, plaintiffs also purchased other surrounding ranches years prior to the taking in question. In 1989, for example, plaintiffs acquired the Winkle parcel for access to the development. The Dotta, Flindt and Pecetti ranches were purchased in 1994. The Nevada Bell parcel was purchased in 1996.

The court reiterates that the alleged taking at issue here involves the 1999 Permit and whether the requirement that there be offsetting mitigation lands, in exchange for the filling of already existing wetlands, constituted a taking of plaintiffs' property. Plaintiffs' decision to purchase additional lands beyond the 470–acre Commercial portion was a business decision made by the plaintiffs in 1994. The government did not force plaintiffs to purchase these lands. Plaintiffs did so because, at that time, they recognized a financial opportunity created by Mr. Helms' bankruptcy. Plaintiffs bought the Helms portion out of concern that other individuals might buy pieces of the property at low prices and put plaintiffs at a competitive disadvantage. As for the other, smaller ranches, those too were purchased with the intent that they be included in the development.

Plaintiffs acquired various parcels to continue their integrated, multiple use concept of the properties, creating a large, planned, mixed-use and self-contained community outside of Reno. In their Section 404 application for the 1995 Permit, plaintiffs described their project as the Double Diamond Development, consisting of approximately 2288 total acres in aerial extent. In their 1998 permit application, plaintiffs describe the property as a 2500–acre planned community and indicated that "South Meadows is composed of a number of historic ranches, the most significant of which is the 2100 acre Double Diamond Ranch." Joint. Ex. 24 at 4. Further, plaintiffs' Alternatives Analysis, which accompanied the 1998 permit application, indicated that it was necessary to have a large contiguous site with immediate freeway proximity, direct freeway interchange access, arterial street proximity to central Reno, and affordable housing.

Thus, based on the foregoing, the "relevant parcel" must include not only the 470–acre Commercial portion purchased in 1988 constituting Phase I of the development, but also the Winkle, Flindt, Pecetti, Dotta and Nevada Bell ranches (but excluding the Farahi ranch) constituting Phase II of the development, *and* the 1800–acre Residential portion, purchased in 1994, constituting Phase III of the development.[14] It does not matter that the Commercial portion, Residential portion and other, smaller ranches that constitute the 2280–acre Development were purchased at separate times, nor that plaintiffs subsequently sold part of the Residential portion to DDH. *See Forest Props.*, 177 F.3d at 1366. The total acreage of these three phases of development is 2280.93 acres. Plaintiffs purchased these parcels for development of a planned and self-contained community and forged a connection between these parcels in their development scheme and permit applications to the City of Reno, and in the Section 404 permitting process, itself.[15]

---

**14.** The Farahi ranch is not included in the relevant parcel because it was not a part of any phase of the 2280–acre Development. That property had been purchased solely for access to the development project and for the NDOT right-of-way and interchange. *See supra* notes 4 and 6.

**15.** The City of Reno viewed the development as a planned development to be conducted in phases. "The PUD standards in effect on Phase III are essentially an extension of the South Meadows Phase I and II standards with regard to roadways, architecture, parking, signs, traffic conditions, etc." Def.'s Ex. 246 at 2. Vince Griffith, plaintiffs' engineer, agreed that it is accurate to describe the South Meadows project as a

Thus, having found that the relevant parcel constitutes the 2280–acre Development, the court also finds that there has been no deprivation of all economically viable use of the area by virtue of the alleged taking of 220.85 acres of wetlands. Further, assuming *arguendo*, that there was absolutely no use for the 220.85 acres of property required to be maintained as mitigation wetlands (ignoring the fact that portions of this area were used as water detention basins and for storm drainage), the percentage decrease in viable use would be less than 10%. This hardly constitutes a total deprivation of economically viable use under *Lucas*. Accordingly, the court finds that there has been no categorical taking of plaintiffs' property.

### 2. *Penn Central* Factors

 Having found that there has been no categorical taking of plaintiffs' property, the court must weigh the three factors of the *Penn Central* ad hoc analysis to determine whether a regulatory taking has occurred in this matter under the specific facts presented. The Supreme Court, in the seminal case of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), identified three factors to be weighed in order to determine whether a regulatory imposition could constitute a taking under the Fifth Amendment, thus requiring compensation on the part of the government for the taking of private property. In this analysis, the court must balance (1) the extent to which the regulation has interfered with the property owner's reasonable investment-backed expectations; (2) the economic impact of the regulation on the claimant; and (3) the character of the governmental action at issue. *Id.* at 124, 98 S.Ct. 2646.

### a. Reasonable Investment–Backed Expectations

 For any regulatory takings claim to succeed, the claimant must show that the government's regulatory restraint interfered with his reasonable investment-backed expectations in a manner that requires the government to compensate him. *See Lovela-*

*dies*, 28 F.3d at 1179. The general principle is that when a private property owner purchases property in reliance on a state of affairs that included the challenged regulatory scheme, then the owner could be said to have no reliance interest, or to have assumed the risk of any economic loss. *See id.* at 1177. "[I]t could be said that the market had already discounted for the restraint, so that a purchaser could not show a loss in his investment attributable to it." *Id.*

"A 'reasonable investment backed expectation' must be more than a 'unilateral expectation or an abstract need.'" *Id.* (citations omitted). "This factor ... incorporates an objective test—to support a claim for a regulatory taking, an investment-backed expectation must be 'reasonable.'" *Cienega Gardens v. United States*, 331 F.3d 1319, 1346 (Fed.Cir.2003) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984)). The analysis is an "objective, but fact-specific inquiry into what, under all the circumstances, plaintiffs should have anticipated." *Id.*

 Prior to 2001, the general premise concerning reasonable investment-backed expectations was that a landowner who bought property with knowledge of a regulatory restraint was assumed to have no reasonable investment-backed expectations. For example, in *Forest Properties, Inc. v. United States*, 177 F.3d 1360, 1363 (Fed.Cir.1999), plaintiff purchased fifty-three acres of land with an option to acquire 9.4 acres of lake-bottom property. Forest Properties exercised its option and sought a Section 404 permit to dredge and fill the lake-bottom land. At the time, the Corps' guidelines governing the issuance of Section 404 permits under the CWA had been in effect for a number of years. When Forest Properties' permit request was denied, it claimed that a taking had occurred by virtue of the fact that the denial deprived Forest Properties of productive use of the lake-bottom property and that title to the lake-bottom land would revert back to the water district, from which

---

planned community in multiple phases, and further, that the phases are interconnected into commercial, residential and industrial subsec-

tions, with interdependent roads, utilities and storm drainage.

Forest Properties had purchased its option. *Id.* at 1364.

The Federal Circuit affirmed this court's ruling that Forest Properties did not have reasonable investment-backed expectations in the lake-bottom land. *Id.* at 1366. When Forest Properties acquired the fifty-three-acre land and the 9.4–acre lake-bottom option, the Corps' guidelines for issuing Section 404 permits had been in place for a number of years. *Id.* The guidelines made it clear that filling wetlands to construct housing was disfavored and that such a project was unlikely to be approved. *Id.* The Federal Circuit then reasoned that "[t]he investment-based expectation criterion 'limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation. One who buys with knowledge of a restraint assumes the risk of economic loss.'" *Id.* at 1367 (citing *Creppel v. United States,* 41 F.3d 627, 632 (Fed.Cir.1994)). Although Forest Properties hoped to obtain a permit and develop the land it acquired, the Federal Circuit noted that having a mere goal or hope is not enough to show that a property owner has a reasonable investment-backed expectation that might be protected by the Takings Clause. *Id.*

Similarly, in *Good v. United States,* 189 F.3d 1355 (Fed.Cir.1999), the Federal Circuit held that a property owner that takes property subject to an existing environmental regulation cannot reasonably expect that it will be allowed unfettered discretion in developing that property. *Id.* at 1363. Good purchased a forty-acre tract of land containing thirty-two acres of wetlands. Good sought to obtain permits necessary to develop the area, including permits under the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, and a Section 404 permit under the CWA. Good proposed filling 7.4 acres of marsh and excavating another 5.4 acres of marsh. The Corps granted Good's requests. However, Good was unable to overcome Florida's Environmental Land and Water Management Act, Fla. Stat. chs. 186.001–.911, 380.012–.12, which created a statutory regime for regulating development in the Florida Keys where Good's property was located.

To further complicate matters, the county in which the property was located adopted new regulations prohibiting the filling of salt marsh to more than 10% of the marsh on the parcel. Since Good's plan involved dredging and filling 25% of the parcel's salt marsh, Good's plan would not have been allowed under the new regulations.

Good sued in state court, alleging that the state had taken his property without just compensation. In the meantime, Good's federal permits to fill wetlands were set to expire. The Corps denied Good's request to extend the time limits on the permits, but allowed Good to submit an application for a new permit, which he received in 1988. However, Good was not ultimately able to get county approval and, finally, Good submitted a new scaled-down plan to the Corps in 1990. Unfortunately, between the time the Corps issued Good's 1988 permit and the time he applied for a permit in 1990, the marsh rabbit had been listed under the Endangered Species Act, 16 U.S.C. § 1533 (1996). The Corps was therefore required to consult with FWS to ensure that the new 1990 permit would not place the rabbit species in jeopardy. FWS recommended denial of the 1990 permit application and also recommended that Good not continue under his 1988 permit. Later, FWS informed the Corps that the silver rice rat had also been listed as an endangered species. The Corps denied Good's 1990 permit application in 1994 and at the same time, the Corps notified Good that his 1988 permit had expired. The Corps based its denial on the threat of danger to the rat and the rabbit should Good's development go forward.

Good sued, alleging that the Corps' denial of his permits created an uncompensated taking in violation of the Fifth Amendment. Good argued that he had reasonable investment-backed expectations in building a residential subdivision on his property. *Good,* 189 F.3d at 1361. In particular, Good argued that the Corps' denial of his permits were based on the Endangered Species Act. Because at the time he purchased his property the Endangered Species Act did not exist, Good argued that he could not have been expected to be denied a permit based on

those provisions. *Id.* The Federal Circuit held, however, that Good could not have had a reasonable expectation that he would obtain approval to fill ten acres of wetlands in order to develop the land. *Id.* at 1361–62. At the time Good purchased the land in 1973, federal law required that a permit be obtained from the Corps in order to dredge or fill wetlands. The Corps has always been concerned with environmental issues concerning fish and wildlife, conservation, ecology, etc., when reviewing permits. *Id.* at 1362. The Federal Circuit noted that Good was aware at the time of the purchase of the need for regulatory approval to develop his land. *Id.* at 1363. "In light of the growing consciousness of and sensitivity toward environmental issues, Appellant must also have been aware that standards could change to his detriment and that regulatory approval could become harder to get." *Id.* With this, the Federal Circuit held that Good lacked a reasonable investment-backed expectation that he would obtain the necessary regulatory approval to develop his property. *Id.*

The original notion that a property owner who acquires property with knowledge of a regulatory imposition or the possibility of a regulatory imposition, (sometimes referred to as the "notice rule"), is essentially precluded from asserting a reasonable investment-backed expectation in the property, was subsequently challenged in the Supreme Court decision, *Palazzolo v. Rhode Island*, 533 U.S. 606, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). In *Palazzolo*, the Supreme Court held that the mere fact that an owner bought property after a regulatory scheme was already in place was not necessarily fatal to a takings claim. *Id.* at 629–30, 121 S.Ct. 2448. In 1959, Palazzolo's investment company, Shore Gardens, bought a waterfront parcel of land. Shore Gardens attempted to obtain permits to fill and dredge the land so that it could be developed as a private beach club, but was refused by the Rhode Island Department of Natural Resources. No further attempts to develop the property were made for over a decade. However, in 1971, Rhode Island enacted legislation creating the Rhode Island Coastal Management Resources Council (Council), an agency charged with protecting the state's coastal properties. Apparently

soon thereafter, the Council's regulations designated salt marshes like those on Shore Gardens' property as protected coastal wetlands on which development was greatly limited. In 1978, Shore Gardens' charter was revoked and Palazzolo became the sole owner of the property at issue. Palazzolo renewed his efforts to develop the property and sent an application to the Council, resembling the prior application, requesting permission to construct a wooden bulkhead along the shore and to fill the entire marshland area. The Council rejected the application, noting that the activities would have a significant impact on the waters and wetlands on the property. Palazzolo submitted a new application in 1985 to fill eleven acres of property, but again he was denied. Palazzolo then filed an inverse condemnation action, asserting that Rhode Island's wetlands regulations, as applied by the Council, had resulted in a taking without compensation.

Palazzolo argued that when the Council promulgated its wetlands regulations, the disputed parcel was not yet owned by Palazzolo, but by the investment corporation of which he was the sole shareholder. When title transferred to Palazzolo, the wetlands regulations were in force. The state argued that Palazzolo was deemed to have notice of the regulations at the time of the transfer, and as such, Palazzolo was barred from claiming that the regulation effected a taking. However, the Supreme Court disagreed. By following the state's logic, the Supreme Court reasoned, any post-enactment transfer of title would, in effect, place an expiration date on the Takings Clause, no matter how extreme or unreasonable. *Id.* at 627, 121 S.Ct. 2448. "Future generations, too, have the right to challenge unreasonable limitations on the use and value of land." *Id.* Despite its holding in this case, the Supreme Court considered that there could be instances where a legislative enactment might be considered to be part of the background principle of a property for some owners, thus undermining a plaintiff's claim of reasonable investment-backed expectations in a property. *Id.* at 630, 121 S.Ct. 2448. However, the Supreme Court did not consider the state regulations as part of the property's back-

ground principle specifically for Palazzolo and allowed Palazzolo the opportunity to have his claim analyzed under *Penn Central's* ad hoc analysis. *Id.*

The Federal Circuit visited the reasonable investment-backed expectations prong post-*Palazzolo* in *Maritrans Inc. v. United States,* 342 F.3d 1344, 1358–59 (Fed.Cir.2003). There, plaintiff Maritrans sued the government for the taking of thirty-seven single hull tank vessels. Maritrans asserted that the vessels were taken by the double hull requirement imposed by Section 4115 of the Oil Pollution Act of 1990, 33 U.S.C. § 2701, *et seq.* (2000) (OPA) which was passed in response to the March 1989 Exxon Valdez oil spill. At the time of the act's passage, Maritrans' vessels were all single hull tank barges which would be forced out of service if not retrofitted with double hulls. Maritrans argued that the act's double hull requirement extinguished all the useful working lives of the barges and deprived it of 100% of the economic value of the barges after their required retirement dates. Maritrans argued that the statute resulted in both a categorical taking and a taking under the *Penn Central* three-part inquiry. With respect to *Penn Central's* reasonable investment-backed expectations prong, the Federal Circuit stated that Maritrans would have to show that it bought the single hull barges in reliance on the non-existence of OPA's double hull requirement. *Maritrans,* 342 F.3d at 1358. Testimony showed that Maritrans reasonably believed that it could use the single hull vessels for their entire working lives. At one point, the Coast Guard had proposed the double hull requirement, but a National Academy of Sciences study disposed of that idea, thus lending to plaintiff's reasonable investment-backed expectations. The Federal Circuit held that Maritrans reasonably relied on the non-existence of OPA, but because the other *Penn Central* factors were not adequately shown by plaintiff, the court found that no regulatory taking had occurred. *Id.* at 1359; *cf. Florida Rock Indus., Inc. v. United States,* 45 Fed.Cl. 21, 39–40 (1999) (finding that because the Clean Water Act was not enacted when plaintiff's property was acquired, interference with plaintiff's reasonable investment-backed expectations were high, since at time of purchase, plaintiff had no reason to believe that its right to mine or develop land would be curbed).

In *Rith Energy, Inc. v. United States,* the Federal Circuit, on petition for rehearing, and finding no inconsistency with *Palazzolo,* determined that Rith's reasonable investment-backed expectations were not frustrated when the government revoked plaintiff's coal mining permit. 270 F.3d 1347, 1351 (Fed.Cir.2001). There, the court noted that coal mining is a highly-regulated industry and property owners can be expected to have impositions on their right to mine coal. In particular, the leases under which Rith operated its coal mines had specifically mentioned the uncertainty of obtaining permits to mine, and the low price that Rith had paid for the leases might have reflected the widely understood risk that Rith would not be permitted to extract as much coal as it had hoped from the leased properties. *Id.* "The likelihood of regulatory restraint is especially high with regard to possible adverse environmental effects, such as potentially harmful runoff from the mining operations, which have long been regarded as proper subjects for the exercise of the state's police power." *Id.*

Similarly, the Court of Federal Claims found that no reasonable investment-backed expectations were frustrated in the post-*Palazzolo* decision, *Cane Tennessee, Inc. v. United States,* 57 Fed.Cl. 115, 128 (2003). There, Cane Tennessee purchased 10,000 acres of land in 1979 and was granted an exclusive leasehold in its mineral interest to Eastern Minerals at that time. Per the lease, Eastern Minerals had the right to mine coal on the land in exchange for paying the greater of a fixed minimum rent or 3.5% of revenues from the mining operations. Two years prior to the purchase, Congress enacted the Surface Mining Control and Reclamations Act, 30 U.S.C. §§ 1201–1328 (1986) (SMCRA) which required permits as a precondition to mining, and established a process whereby the Secretary of the Interior could designate land as unsuitable for surface mining. Eastern Minerals was able to obtain the required permits without problems until about 1984, when its application to renew its mining permit was denied. 57 Fed.Cl. at

120. Eastern Minerals continued unsuccessfully to pursue a permit until 1994. By the time the United States Department of Interior, Office of Surface Mining (OSM) rendered a final decision on the merits of Eastern Minerals' 1994 application, its lease with Cane Tennessee had expired. *Id.* In 1995, OSM accepted and undertook consideration of a petition by Save Our Cumberland Mountains, a concerned citizens group, to designate as unsuitable for surface coal mining operations land encompassing and adjacent to plaintiff's property. *Id.* Consequently, in 2000, the Secretary issued a letter of decision designating most of Cane Tennessee's land as unsuitable for surface coal mining. Cane Tennessee filed suit, alleging that a taking of its property had occurred by the designation. With respect to whether the designation had interfered with Cane Tennessee's reasonable investment-backed expectations, Cane Tennessee argued that the "notice rule" had been rejected in *Palazzolo* and accordingly, it could prove reasonable investment-backed expectations in being able to mine property purchased after the passage of SMCRA. This court, however, disagreed with Cane Tennessee, recognizing that the holding in *Palazzolo* does not mean that the timing of the regulation's enactment is immaterial to the *Penn Central* analysis. *Id.* at 126, 98 S.Ct. 2646 (citing *Palazzolo,* 533 U.S. at 633, 121 S.Ct. 2448 (O'Connor, J. concurring)). The court noted that in *Rith,* the Federal Circuit stated that where plaintiff is involved in a highly-regulated industry, such as mining, "the plaintiff's reasonable investment-backed expectations are an important consideration in the takings calculus .... A party in Rith's position necessarily understands that it can expect the regulatory regime to impose some restraints on its right to mine coal under a coal lease." *Id.* (citing *Rith,* 270 F.3d at 1351). Based on *Palazzolo* and its progeny, the court in *Cane Tennessee* then concluded that Cane Tennessee had no reasonable investment-backed expectations. Although the plaintiff had no coal mining experience, and thus, the mere existence of a regulatory regime would not in and of itself have put plaintiff on notice of the imposition, the bank had informed plaintiff that there were permitting requirements. The court

concluded that a reasonably prudent investor should have known that there would be regulations on the property, especially in a multi-million dollar transaction. *Id.* at 127.

Despite the holdings in *Cane Tennessee* and *Rith,* the fact that a private property owner is in a highly-regulated field, does not necessarily mean that such property owner *never* has a reasonable investment-backed expectation in its right to develop or utilize its property. For example, in *Chancellor Manor, Ltd. v. United States,* 331 F.3d 891, 906 (Fed.Cir.2003), Chancellor Manor owned various multi-family rental housing projects financed under the National Housing Act, which granted tax breaks and other incentives to owners in exchange for maintaining the properties as low-income housing areas. An additional incentive was the right to prepay mortgages without approval by the Department of Housing and Urban Development (HUD). By prepaying the balance of the mortgage, an owner could terminate HUD's affordability restrictions imposed on the property and convert the property into a conventional rental property. In the late 1980's Congress became concerned that owners participating in this program might exercise their prepayment option, creating a shortage in the supply of low-income housing. Thus, in 1988, Congress passed the Emergency Low–Income Housing Preservation Act (ELIHPA) which placed a two-year moratorium on mortgage prepayments. In 1990, ELIHPA was replaced by the Low–Income Housing Preservation and Resident Homeownership Act (LIHPRHA) which made the prior moratorium on mortgage prepayment permanent and required HUD approval for any prepayment. Pursuant to LIHPRHA, Chancellor Manor and the other property owners listed in the lawsuit notified HUD of their intention to prepay their mortgage. They were advised, however, that they would not be permitted to do so and subsequently they filed suit, alleging that the LIHPRHA legislation had resulted in a taking of their protectable interests in the housing projects. *Id.* at 897. In undergoing the *Penn Central* regulatory takings analysis, the Federal Circuit specifically noted that, with respect to the holding in *Palazzolo,* the "subjective expectations of the Appellants are irrelevant

.... The critical question is what a reasonable owner in the Appellants' position should have anticipated." *Id.* at 904. The government argued that low-income housing is a highly-regulated industry, defeating the owners' claim to reasonable expectations. *Id.* at 906. However the *Chancellor Manor* court had specifically noted that in *Cienega Gardens,* the Federal Circuit reasoned that "the highly regulated nature of the subsidized housing industry 'does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever.'" *Id.* (citing *Cienega Gardens,* 331 F.3d at 1350) (emphasis in the original). At the same time, the *Chancellor Manor* court also noted that the level of regulation is relevant. *Id.* In citing *Cienega Gardens* and *Commonwealth Edison v. United States,* 271 F.3d 1327, 1348 (Fed.Cir.2001), the *Chancellor Manor* court observed that the extent of regulation is a *relevant* factor in the determination of reasonable expectations, but is simply not a determinative factor. *Id.* at 906.

Two general principles may be discerned from this precedent. First, simply because a private property owner is in a highly-regulated field, does not, by itself, mean that the owner has no reasonable investment-backed expectations in its ability to develop or otherwise utilize its property. Second, the holding in *Palazzolo* that a property owner may still argue that it maintains a reasonable investment-backed expectation in property purchased while the challenged regulatory scheme was already in effect and known by the owner at the time of purchase is not an absolute renunciation of the "notice rule." The *Palazzolo* court specifically stated that there could be "circumstances when a legislative enactment can be deemed background principle." 533 U.S. at 629, 121 S.Ct. 2448.

■ Keeping these principles in mind, it is important to identify the regulatory scheme at issue in the case at bar. The Clean Water Act, per the Federal Water Pollution Control Act Amendments of 1972, was enacted in 1972, well before plaintiffs acquired any properties at issue herein. The CWA prohibits the discharge of pollutants into the waters of the United States, except in compliance with, *inter alia,* Section 404 of the Act. *See* 33 U.S.C. §§ 1251(a), 1311(a) (2000). There is no doubt, based on the evidence presented at trial, that the Normans were sophisticated real estate developers who had both actual and constructive knowledge of the Section 404 permitting process. Prior to the Normans' initial purchase of the 470–acre Commercial portion in 1988, Don Roger Norman specifically stated that he would not "close the deal" without a wetlands determination from the Corps. Tr. at 133. It is evident that plaintiffs were unwilling to purchase the 470–acre Commercial portion until the Corps completed a final delineation of the property.

Aware of the fact that the regulatory regimen for filling and dredging wetlands under the CWA was in effect years prior to the property acquisitions at issue here, for the purposes of determining whether plaintiffs had a reasonable investment-backed expectation in their ability to develop the 220.85 acres that plaintiffs claim were taken when the Corps required this acreage to be maintained and designated as wetlands in exchange for the dredging and filling of other wetlands, this court must undertake the reasonable investment-backed expectations determination in steps. Because the 220.85 acres at issue were acquired at different points in the development, plaintiffs' reasonable investment-backed expectations in this acreage are different for each portion of the claimed land. The court addresses each specific wetland area in turn below.

### 1. WL 20

The 1.32 acres of WL 20 claimed to have been taken by the Corps' 1999 Permit requirements are located on the 470–acre Commercial portion. These 1.32 acres of WL 20 were delineated as wetlands as part of the original delineation in 1988 when the Corps delineated a total of seventeen acres of wetlands on the 470–acre Commercial portion. From the court's perspective, there was no interference with any investment-backed expectation regarding plaintiffs' ability to develop or otherwise use this 1.32 acres of wetlands because, at the time of purchase, plaintiffs knew that this area had been delineated as wetlands by the Corps, yet plaintiffs

purchased the Commercial portion with that knowledge and understanding, and considered this delineation to have a minimal impact. In actuality, Southmark's original master plan for development encompassed the seventeen acres of wetlands designated on the Commercial portion into the design of the development project, making them usable for landscaping and other non-distributing uses allowed under the CWA. It is clear that plaintiffs knew of the regulatory imposition, relied on it, and utilized it to their advantage. Accordingly, the court finds that plaintiffs had no reasonable investment-backed expectation to develop the 1.32 acres of WL 20 claimed to have been taken.

### 2. WL 21

The 4.82 acres of wetlands situated on WL 21, and claimed to have been taken by the issuance of the 1999 Permit, were also delineated in 1988. This acreage is on the 470–acre Commercial portion purchased by plaintiffs in 1988. As was the case with the 1.32 acres of wetlands on WL 20, the court does not agree that the Corps' requirements, encompassed in the 1999 Permit, interfered with plaintiffs' reasonable expectations in developing this acreage because plaintiffs purchased this property with full knowledge that the 1988 wetlands delineation included this area. Plaintiffs were fully aware of this delineation when the property was purchased but nevertheless bought the property. As with WL 20, this area was also incorporated into the design of the overall master development plan. Accordingly, the court finds no reasonable investment-backed expectation in the 4.82 acres of land on WL 21.

### 3. WL 17B

The 4.07 acres of WL 17B claimed by plaintiffs to have been taken by the Corps through the issuance of the 1999 permit are located on the 470–acre Commercial portion, but were delineated by the Corps in 1991, three years after plaintiffs purchased that parcel in 1988. Defendant argues that any reasonable investment-backed expectations plaintiffs may have had in their ability to develop this land was not thwarted by the mere fact that the Corps designated this land as wetlands in the 1991 delineation, three years after plaintiffs purchased the 470–acre

Commercial portion without WL 17B having been designated as protected wetlands in 1988. Defendant contends that this is the case because the 1999 Permit allowed plaintiffs to develop virtually all of the land on the 470–acre Commercial portion, including almost all acreage designated as wetlands by the 1991 re-delineation, while only requiring the maintenance of eleven acres as wetlands. This, defendant argues, is less acreage to be maintained as wetlands than the seventeen acres originally delineated on the Commercial portion in 1988. Consequently, defendant contends that plaintiffs' reasonable investment-backed interests in all of the land on the 470–acre Commercial portion were enhanced.

Defendant's argument, the court believes, speaks more to the economic impact prong of the *Penn Central* analysis than the reasonable investment-backed analysis being conducted here. A property owner's reasonable investment-backed expectations are defined at the time the property is purchased. *Appolo Fuels,* 381 F.3d at 1349. Thus, it would be inappropriate for the court to evaluate plaintiffs' reasonable investment-backed expectations in the 470–acre Commercial portion by reference to the fact that the 1999 Permit allowed plaintiffs to fill almost all of the wetlands designated on that tract in 1991, as defendant essentially suggests. The court must evaluate WL 17B with reference to the time plaintiffs acquired that acreage in 1988.

It is the court's opinion that plaintiffs had a reasonable investment-backed expectation that they would be allowed to develop and utilize WL 17B at the time the Commercial portion was purchased in 1988, and that this area would not be designated as wetlands. The 1991 re-delineation of wetlands by the Corps stripped plaintiffs of their expectation that they could develop wetland 17B. Plaintiffs had no basis to believe, once the 1988 delineation was in place, that the 1991 delineation would subsequently follow. Plaintiffs could not have anticipated that WL 17B would be delineated as wetlands in 1991 at the time that plaintiffs purchased the Commercial portion in 1988. The Corps gave plaintiffs no reason to believe that more wetlands would subsequently be delineated on

the Commercial portion other than those that were already delineated in 1988. Accordingly, the court finds that plaintiffs maintained a reasonable investment-backed expectation in their ability to develop the 4.07 acres of WL 17B.

### 4. WL 16

The 104.85 acres of wetlands located on WL 16 that are claimed by plaintiffs to have been taken by the Corps via the issuance of the 1999 Permit and the Deed of Restrictions are located on the 1800–acre Residential portion. This area was delineated as wetlands by the Corps in 1991. Plaintiffs purchased the 1800–acre Residential portion in 1994 from the Helms' bankruptcy estate.

The holding in *Palazzolo,* at first blush, might appear to aid plaintiffs here. One of defendant's chief arguments is that any wetlands delineated on the 1800–acre Residential portion purchased by plaintiffs in 1994 were known to plaintiffs at that time, since the acquisition of the parcel occurred three years after the 1991 re-delineation of wetlands. According to defendant, plaintiffs should be precluded from asserting that they had any reasonable investment-backed expectations to develop those areas designated as wetlands on the Helms property in 1991, because plaintiffs purchased that property in 1994 with full knowledge of the delineation. Plaintiffs counter that the Supreme Court's holding in *Palazzolo* allows plaintiffs to assert their takings claim, despite the fact that the Helms portion was acquired after the 1991 re-delineation.

*Palazzolo* is distinguishable from the facts here. The property at issue in *Palazzolo* was purchased by plaintiff's investment company, Shore Gardens. At that time, no regulatory scheme was in place to protect Rhode Island's coastal properties. 533 U.S. at 614, 121 S.Ct. 2448. However, after Shore Gardens' purchase, Rhode Island enacted legislation to protect its coastline, including protecting coastal wetlands. When Shore Gardens lost its charter for failure to pay corporate income taxes, Palazzolo became the sole owner of the property. Palazzolo did not purchase the land with knowledge of a regulatory imposition. Rather, he acquired property

when original ownership transferred from his investment company to him.

This is in stark contrast to the Normans. The 1800–acre Residential portion was purchased by plaintiffs from the Helms' bankruptcy estate three years after the 1991 delineation of wetlands on that area. Plaintiffs bought this land with an eye toward developing both the Commercial and Residential portions in phases to create one integrated commercial, residential and industrial community. They made the purchase with full knowledge of the delineation, and in fact, asked that the 1991 delineation be extended. Plaintiffs' acquisition was an affirmative business decision pursued with the intent of developing the South Meadows properties in three phases and to ward off other potential purchasers of the Helms portion who might not develop the 1800–acre Residential portion in conjunction with plaintiffs' plans. Whereas Palazzolo was not the owner of the property at the time that a regulatory imposition was placed into effect and a potential takings claim had ripened, this is not the scenario here. Plaintiffs in this case already owned the disputed property and were actively engaged in the regulatory process, having sought to have a final delineation issued. Thus, this court finds that the facts in this case distinguish it from *Palazzolo,* and, since plaintiffs purchased the 104.85 acres of WL 16 in 1994, subsequent to the 1991 delineation and with full knowledge of the wetlands delineations, the court finds no reasonable investment-backed expectations in the 104.85 acres of WL 16 that were frustrated by the issuance of the 1999 Permit.

### 5. WL 22

The 5.5 acres of wetlands on WL 22 claimed to have been taken by the 1999 Permit were delineated in 1988 and are located on the 1800–acre Residential portion purchased by plaintiffs in 1994. Like the wetlands delineated on the 470–acre Commercial portion in 1988, plaintiffs purchased this land in 1994 with full knowledge of the delineation and the overall regulatory imposition. As discussed by the court with respect to WL16, *Palazzolo* does not serve to aid plaintiffs here. Plaintiffs had no reasonable invest-

ment-backed expectations in developing the 5.5 acres of wetlands located on WL 22.

### 6. C–1, C–2 and the Thomas and Delta Channels

Plaintiffs claim that the 1999 Permit and/or the Deed of Restrictions required plaintiffs to designate and maintain as wetlands 65.94 acres on area C–1, 6.82 acres on area C–2, 1.314 acres of waters in the Delta Channel, and 2.02 acres of waters in the Thomas Channel in exchange for obtaining the 1999 Permit. Areas C–1, C–2, and the Thomas and Delta Channels were not delineated as wetlands under either the 1988 or 1991 delineations. Rather, these areas served as part of the Ranch property's extensive drainage system. Area C–1 serves as a large detention basin in the northeast corner of the entire development. Area C–2 is a smaller detention basin located adjacent to WL 22 and was completed in 1997. The C–2 detention basin collected irrigation water from neighboring WL 22. The Delta and Thomas Channels were also constructed to serve for storm drainage runoff.

Plaintiffs constructed the 2280–acre Development's drainage system based on plans provided by Reno Engineering. Reno Engineering created drawings for the Delta Channel and area C–2 based upon flow data supplied by Nimbus Engineering, a consulting firm specializing in flood control. In 1996, Nimbus Engineering prepared a report on behalf of Reno Engineering and South Meadows which outlined a design concept for the drainage system of the 2280–acre Development area. The C–2 detention basin was specifically constructed for drainage based upon the grade and elevation of the property. The Delta Channel was also to be incorporated into the drainage system. Vince Griffith testified that the design of the flood control system, including the backfilling of large ditches constructed by Helms and the creation of wider, more shallow channels was, in fact, a design contemplated months before the issuance of the 1995 Permit and before the mitigation proposal was provided to the Corps. Construction of both the C–1 and C–2 detention basins and drainage canals was completed years prior to plaintiffs' application for the 1999 Permit.

In their 1998 Section 404 permit application, plaintiffs proposed that the main mitigation area be at the C–1 detention basin as part of the land swap negotiated by plaintiffs with the Corps in exchange for filling 60.42 acres of land on the Commercial portion. Area C–1 was contemplated to be a water detention basin for the entire 2280–acre Development area as early as 1996, two years prior to the permit application, when Nimbus Engineering produced a design and concept for the storm drainage system. The Nimbus report also specifically called for the creation of the Delta Channel. It is evident that this water detention basin and the water channels leading from it were designed for the entire Ranch area, regardless of the mitigation plan included in the 1999 Permit.

The agreement reached between the Corps and plaintiffs, as set forth in the 1999 Permit, essentially allowed plaintiffs to utilize the C–1 detention basin in a way that plaintiffs had been contemplating since 1996. The water detention basin serves a valuable function to the Ranch property area for storm run-off and flood control. Plaintiffs constructed the detention basin and drainage system pursuant to the requirements of the development and not because of any mandate by the Corps. Plaintiffs received mitigation credit in the detention basin area and nearby drainage channels, yet continued to enjoy the valuable and necessary functions performed by those same drainage facilities. Although the C–1 area did not necessarily have to be a drainage area, a drainage area was needed somewhere in the development.

Accordingly, it is the court's opinion that plaintiffs did not have any reasonable investment-backed expectations to utilize C–1, C–2 or the above-referenced waterways in ways other than how plaintiffs had already been using these lands when they proposed their contemplated mitigation wetlands, as included in the 1999 Permit. In simple terms, plaintiffs essentially received a windfall by being able to utilize already existing drainage lands as mitigation wetlands in exchange for filling valuable commercial property.

### 7. North Channel

Plaintiffs claim that the Corps took 24.25 acres of the North Channel by requiring that

such lands be maintained as mitigation wetlands in the Deed of Restrictions. The North Channel is located on the Residential portion purchased by plaintiffs in 1994. As with areas C–1, C–2, and the Thomas and Delta Channels, the North Channel was not delineated as wetlands under either the 1988 or 1991 delineations. Rather, this area also served as part of the Ranch property's extensive drainage system. Although, plaintiffs presented little testimony at trial about this acreage, they did offer that prior to the alleged taking, these acres were utilized as additional drainage areas in connection with the property's detention basins. Plaintiffs argue that this acreage served as a flood plain for the C–1 detention basin, which was a requirement of the 1999 Permit, but it was also specifically designated as a mitigation area in the Deed of Restrictions. The court does not find that any reasonable investment-backed expectation was thwarted with respect to these 24.25 acres of wetlands, given that the 1999 Permit and the Deed of Restrictions simply allowed plaintiffs to continue to utilize this area for storm drainage and flood control.

Given the foregoing analysis of the breakdown of the wetland acreage, plaintiffs only had a reasonable investment-backed expectation in the 4.07 acres of wetlands located on WL 17B that were delineated in 1991, after plaintiffs purchased the Residential portion. As to the remaining wetland areas, the court finds that though plaintiffs may have held an internal expectation that they would be able to develop that property without being hindered by any regulatory imposition, such an expectation was not a reasonable investment-backed expectation as defined by takings jurisprudence. *See Cienega Gardens,* 331 F.3d at 1346 (citing *Ruckelshaus,* 467 U.S. at 1005, 104 S.Ct. 2862). Plaintiffs were not reasonable in their expectation that they would be allowed unfettered discretion to develop the remaining acreage claimed, given that all wetland areas, except for WL 17B, were either: (1) acquired by plaintiffs with actual knowledge that the Corps restricted development of those areas under the Clean Water Act, or (2) designated for use by plaintiffs in a manner consistent with prior drainage functions.

### b. Economic Impact

Having found that plaintiffs only possessed a reasonable investment-backed expectation in the 4.07 acres of wetlands located on WL 17B, the court will next determine what economic impact the alleged taking had on the property at issue.

The "economic impact" criterion of *Penn Central* is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies,* 28 F.3d at 1176. In determining the economic impact of the regulatory imposition on a property, the court is required to evaluate the change in fair market value as a result of the regulation. *Walcek v. United States,* 49 Fed.Cl. 248, 258 (2001), *aff'd,* 303 F.3d 1349 (Fed.Cir.2002). The fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts." *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973) (citation omitted). In other words, the court must "compare the value that has been taken from the property with the value that remains in the property." *Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 497, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). "The economic analysis," this court has noted, "is often expressed in the form of a fraction, the numerator of which is the value of the subject property encumbered." *Walcek,* 49 Fed.Cl. at 258; *see also Florida Rock Indus., Inc. v. United States,* 18 F.3d 1560, 1567 (Fed.Cir.1994).

The fair market value of property is most traditionally and frequently calculated using the comparative sales approach. *Vaizburd v. United States,* 384 F.3d 1278, 1283 (Fed.Cir. 2004) (the usual approach for ascertaining damages is to calculate the property's market value based on comparative sales); *Good v. United States,* 39 Fed.Cl. 81, 106 (1997); *Whitney Benefits, Inc. v. United States,* 18 Cl.Ct. 394, 408 (1989), *aff'd,* 926 F.2d 1169 (Fed.Cir.1991). The "comparable sales method" is the generally accepted metric for

determining the economic impact. *Florida Rock Indus., Inc. v. United States,* 45 Fed. Cl. 21, 35 (1999). Under this method, the appraiser must estimate the fair market value of the relevant parcel based upon similar transactions in similar properties in the vicinity, reasonably near the time of the alleged taking. *Good,* 39 Fed.Cl. at 106. This approach uses sales and purchases of property that reasonably resemble the subject property with respect to time, place and circumstances to arrive at the fair market value of the property being appraised. *Whitney Benefits,* 18 Cl.Ct. at 408.

There are, however, instances when the comparable sales method is not suitable for a particular situation. *Good,* 39 Fed.Cl. at 106. This usually occurs when there is no market data available to compare to the relevant parcel. *Id.* At this point, it is then possible to analyze the fair market value based upon the "subdivision development method." *Id.* Under the subdivision development method:

All direct and indirect costs [of development] and entrepreneurial profit are deducted from an estimate of the anticipated gross sales price of the finished lots; the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development absorption period to indicate the raw value of land.

*Id.* (citing *The Appraisal Institute, Dictionary of Real Estate Appraisal* 354 (3d ed.1993)). The court in *Good* found that this approach " 'is highly speculative, prone to error, and reflects not so much the value as the highest price a developer can afford to pay for the land and still earn the desired profit.' " *Id.* (citing *Uniform Appraisal Standards for Federal Land Acquisition A–8* (1992)).

In addition to the "subdivision development method," the Federal Circuit has also approved the "discounted cash flow method" in at least one instance of mining rights. *Whitney Benefits,* 926 F.2d at 1178 (affirming lower court's use of discounted cash flow method for valuing real estate). This approach values the property based on the discounted stream of income the property is capable of producing over its useful economic life. *Whitney Benefits,* 18 Cl.Ct. at 408.

Comparable sales are used to establish gross revenue for the project, from which costs of development are then deducted, resulting in a stream of revenue that is then present-valued using a discount factor to derive a value for the property. *Walcek,* 49 Fed.Cl. at 263.

Regardless of which method is chosen, trial courts have considerable discretion to select the method of valuation that is most appropriate in light of the facts of each particular case. *Seravalli v. United States,* 845 F.2d 1571, 1575 (Fed.Cir.1988). While it is important to utilize the appropriate methodology for calculating the fair market value, it is clear that the court need not make adjustments for inflation and other market uncertainties. *See Walcek,* 303 F.3d at 1356. The Federal Circuit has noted that this court need not to take into account the plethora of uncertainties and complexities that inflationary adjustment would entail. *Id.* at 1356–57. "Attempting to make additional adjustments for inflation or deflation would require the sagacity of Solomon and the wizardry of Merlin." *Id.* at 1356.

Furthermore, the calculation of the fair market value for a property does not always include what the highest and best use of the property would have been without the regulatory imposition. *Yancey v. United States,* 915 F.2d 1534, 1540 (Fed.Cir.1990) (citing *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987)). At the same time, a regulation can be a taking if its effect on a landowner's ability to put his property to productive use is sufficiently severe. *Id.* (citing *Florida Rock,* 791 F.2d at 900).

Earlier, this court determined that the relevant parcel, or parcel as a whole, for determining the economic impact of the 1999 Permit and the Deed of Restrictions, is the 2280–acre Development. Having defined the subject property whose value is to be captured in this economic analysis fraction, the court must next place values on the numerator and denominator of that fraction. For that purpose, the court must look to the expert evidence presented at trial.

## 1. Plaintiffs' Expert Appraisal

Plaintiffs employed the expert testimony of Mr. William Kimmel, an independent real estate appraiser and consultant with over thirty years of experience in appraising residential developments, vacant land, and commercial and industrial properties. Mr. Kimmel calculated the fair market value of what plaintiffs argue is the relevant parcel, that is, the 220.85 acres claimed to have been taken as of August 31, 1999 (the date the 1999 Permit and the Deed of Restrictions were issued) by utilizing the comparable sales approach.[16] Unfortunately, Mr. Kimmel did not calculate the before and after fair market value of what the court has determined the relevant parcel to be, i.e., the 2280–acre Development. Nonetheless, Mr. Kimmel's appraisal is certainly useful to the court, and warrants a full discussion.

Mr. Kimmel found that a comparable sales approach would yield the most accurate assessment of the 220.85–acre Development's fair market value, especially since in this particular case, Mr. Kimmel was able to utilize actual sales of the portions of the development area that had been sold to independent third parties by plaintiffs before and up to the time of the alleged taking on August 31, 1999. Because Mr. Kimmel had actual sales data of what buyers were willing to pay in the marketplace, he was able to extract a close approximation of what the fair market value of the 220.85 acres would be if they were developed according to their highest and best use. Mr. Kimmel stated:

> You try to compare the sales that are as similar as possible to the property that you're appraising. That would be similar in location aspects, similar in zoning, as similar as possible in size, similar in topography, similar in accessibility and certainly similar as far as utilities and overall amenities.... The more comparable you can find a sale, the less judgment calls you have to make.

Tr. at 756–57. Thus, utilizing the "comparable sales" methodology, Mr. Kimmel determined that the fair market value of the 220.85 acres claimed to have been taken was $34,233,000. He came to this conclusion by determining the highest and best use of each of the individual wetlands areas claimed to have been taken and by evaluating what use such parcels could have served if each had been allowed to be developed at its highest and best use.

Mr. Kimmel determined that WLs 17B, 20, 21 and 42.27 acres of WL 16 could be used primarily as professional office development or for light commercial development. He valued WLs 17B, 20 and 21 to have a value of $8 per square foot, and he calculated 42.27 acres of WL 16 to have a value of $6.50 per square foot. Thus, the total value for this acreage was calculated to be $15,526,000, with $11,986,000 specifically being attributed to 42.27 acres of WL 16. By using the actual sales of parcels in the vicinity, Mr. Kimmel was able to make this appraisal. In particular, with respect to WL 21 and WL 20, Mr. Kimmel determined that these parcels were located in an area of existing professional office development, and accordingly, he determined that the highest and best use of these areas would be for a "professional office type development." Tr. at 773. With respect to WL 17B, Mr. Kimmel testified that this area could also be used for commercial or professional office space as it is located in the same area as the Washoe Medical Center. With respect to 42.27 acres of WL 16, Mr. Kimmel testified that because this area was located near ten or twelve single-story professional office buildings, this area "would also have office like commercial type of use and utilization." Tr. at 777.

Mr. Kimmel also determined that 62.53 acres of WL 16 and thirty acres of area C–1 could be utilized for multiple residential development. By analyzing the sales of other residential areas in the 2280–acre Development area, Mr. Kimmel theorized that the value of the remaining 62.53 acres of WL 16 would be worth $9,567,000 and the value of thirty acres of area C–1 would be worth $4,590,000, for a total value of $14,157,000. Mr. Kimmel testified that thirty acres of area

---

**16.** Mr. Kimmel actually looked at the fair market value as of August 27, 1999, instead of the date of the alleged taking of August 31, 1999. Mr. Kim-mel testified, however, that his same appraisal could be applied to the August 31, 1999 date and that his opinion would not change.

C–1 could be developed for high-end residential use.

Lastly, with respect to the remaining areas that serve as mitigation wetlands, those being WL 22, area C–2, 35.94 acres of area C–1, 3.33 acres of the Thomas and Delta Channels and 24.25 acres of the North Channel, Mr. Kimmel determined that these would be worth $60,000 per acre, for a total value of $4,550,000, although Mr. Kimmel testified that he assumed that those areas could not actually be developed because they already served as mitigation areas. Mr. Kimmel stated:

> [A]ssuming you did not have the restriction from the Corps of Engineers that you had to have those mitigation areas, then you would be free to sell those to other people for mitigation, and that would be the highest and best use for those. They would not be able to be built upon.

*Id.* at 787. Thus, Mr. Kimmel did not clearly identify in either his testimony or expert report what functions these wetlands areas could serve if they were developable, other than for mitigation.

Mr. Kimmel did not conduct a "before" and "after" appraisal of the fair market value of the property as would normally be the case under the comparable sales approach. Mr. Kimmel testified that he did not conduct the before and after appraisal of the 220.85 acres of property valued because, in this particular case, such a determination was not workable. He explained that a more accurate appraisal could be made simply by looking at each individual wetland area, since in a normal scenario, one buyer would not typically purchase individual properties with separate uses at one single time. He opined that it would be difficult to conduct a before and after appraisal with respect to the entire 220.85–acre area. Rather, it made more sense, in Mr. Kimmel's opinion, to simply evaluate the fair market value of each wetland area, without any regulatory restriction, as developed at its highest and best use. That, according to plaintiffs, would have resulted in a fair market value of $34,233,000.

The court does not find Mr. Kimmel's expert appraisal to be helpful in the analysis of the facts presented herein. First and foremost, Mr. Kimmel did not address the economic impact of what the court has determined to be the relevant parcel in this matter. Second, and despite Mr. Kimmel's statement otherwise, Mr. Kimmel failed to conduct a "before" and "after" analysis of the fair market value of the relevant parcel as normally required under the comparable sales approach for determining economic impact. Mr. Kimmel's appraisal merely results in a summation value. Third, as defendant notes, Mr. Kimmel's appraisal does not represent the market value of the 220.85 acres of wetlands because it uses retail values of comparables, without consideration of the time and cost of creating and achieving these retail values; and it represents merely the sum of the retail values of the individual parcels claimed to be taken.

**2. Defendant's Expert Appraisal**

Defendant's expert, Mr. Lee Smith, is a real estate appraiser who has been doing appraisals for over thirty years. He was a contributor to various editions of *The Appraisal of Real Estate* (12th ed.2001) and was also a contributor to the latest text on rural valuation published by the Appraisal Institute and the American Society of Farm Managers and Rural Appraisers.

Unlike Mr. Kimmel, Mr. Smith appraised the entire 2280–acre Development the court has found to constitute the relevant parcel. However, in finding that the comparable sales approach method could not adequately be used given that no large vacant land parcels compare to the entire 2280–acre relevant parcel in this case, Mr. Smith utilized the "subdivision" method for determining the fair market value before and after the date of the alleged taking. As stated previously, the subdivision method involves an estimate of the anticipated gross sales price of the finished lots and the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development absorption period to indicate the raw value of the land. *Good,* 39 Fed.Cl. at 106 (citing *The Appraisal Institute, Dictionary of Real Estate Appraisal* 354 (3d ed.1993)).

Just prior to the time that Mr. Smith calculated his appraisal, all but 716 acres of

the 2280–acre Development had been sold by plaintiffs to various third-party entities in different individual sales. Because approximately 1564 acres of land had been already sold by plaintiffs, Mr. Smith focused on the remaining 716 acres to determine the economic impact of the 1999 Permit, which includes the property at issue in this lawsuit. Mr. Smith reasoned that because 1564 acres had been sold off to independent third-party buyers, the fair market value of that land was already established by virtue of the fact that the land had been sold in the open market. In particular, Mr. Smith noted in his appraisal report:

> The Larger Parcel, for economic evaluation purposes as determined in the appraisal report, is South Meadows Planned Unit Development Phases I, II and III. The South Meadows developers put infrastructure (including underground utilities and roads) to parcels that were, and are to be, sold. Because the project was a PUD, parcel sizes and shapes were created for buyers' needs .... Sales were initiated in 1994. The ± 798–acre single-family residential development in Phase III was sold to a single residential developer. At the date of value ±69% of the project was sold. The Larger Parcel for valuation purposes in this analysis will be the unsold portion of South Meadows Planned Unit development Phases I, II and III, as of August 31, 1999.
>
> There were approximately ±715.962 acres unsold in the project as of August 31, 1999. The market value in the before and in the after will be based upon what a purchaser would pay in a single bulk sale for the unsold remainder as of August 31, 1999.
>
> This appraisal is being prepared in July, August, and September of 2002. This offers the benefit of "hindsight." The project has had an active and continuing sales program since the date of value, with the last sale for this analysis as of July 2, 2002. The actual sales and expenses that have occurred from August 31, 1999, to July 2, 2002, will be used. These sales and expenses will be discounted at a market interest rate to the date of value. The unsold remainder will be valued and dis-

counted along with the estimated remaining expenses to the date of value.

Def.'s Ex. 255 at 5–6.

The court finds that Mr. Smith's analysis is an accurate assessment of what occurred with respect to the development of the property. Given that the relevant parcel is the three-phase 2280–acre Development area, there is no need to hypothesize as to the fair market value of the 1564 acres of that land that has already been sold in the open market to individual buyers. Since this number is already known, defendant's expert only needed to calculate the fair market value of the remaining 716 acres, which includes the 195.84 acres claimed to have been taken solely under the 1999 Permit. As stated, Mr. Smith made this calculation by utilizing the "subdivision method." This involved breaking down the 716–acre unsold remainder into various sections of land, and determining whether such sections of land would be sold off in a commercial, office, light industrial or residential capacity.

Mr. Smith determined that prior to August 31, 1999, the date of issuance of the 1999 Permit, the value of the 716 acres of unsold land was $24,991,342 (taking into account discounting factors). Using a highest and best use appraisal, Mr. Smith determined that the fair market value per square foot for commercial land would be $10; $5 for light industrial land; $4 for industrial land; and $1 for residential land. Mr. Smith determined that "the subject commercial parcels are located on the southwest, northwest, and northeast corners of the Double R Boulevard and Damonte Ranch Parkway interchange in close proximity to the Damonte Ranch Parkway/I–580 interchange." Def.'s Ex. 255 at 62. Mr. Smith determined that light industrial land was located in the area primarily between Double R Boulevard on the west and Double Diamond Parkway on the east, north of the Thomas Creek Lumberjack Channel. Mr. Smith determined that the industrial area was located primarily east of the Double Diamond Parkway and north of the South Meadows Parkway, and the residential area could potentially be located in the C–1 detention basin. Using this appraisal for the unsold 716 acres, and the already

existing sales data for the previously sold 1564 acres of the 2280–acre Development area, Mr. Smith was able to calculate a "before" and "after" valuation of the relevant parcel.

Immediately before the issuance of the August 31, 1999 Permit, Mr. Smith determined that the fair market value of the relevant parcel was $33,105,963. Immediately after the issuance of the 1999 Permit, Mr. Smith calculated that the fair market value of the 2280–acre Development to be $48,005,870. Mr. Smith came to this valuation by recognizing that the 1999 Permit allowed plaintiffs to develop 62.98 of wetlands on the valuable Commercial portion for "office/light industrial development." Def.'s Ex. 255 at 74–75. He stated that:

This acreage and additional upland fingers that were undevelopable in the "before" were sold after August 31, 1999 for $6,50/sq. ft. The 62.98 acres located within Detention Basin C–1 identified for creation of wetlands only contained 30 developable acres. The 30 developable acres had future residential development potential, but would have a significantly lower value as of August 31, 1999.

The implications of U.S. Army Corps of Engineers' Permit No. 199825043 on the actual status of the property as of August 31, 1999, recognizing the existing legal and physical restrictions on the property, were financially positive.

*Id.* at 75.

Accordingly, by virtue of the issuance of the 1999 Permit, Mr. Smith calculated that plaintiffs achieved an *increase* in economic value in the relevant parcel of $14,899,907. This resulted from the ability to fill more valuable commercial property close to the freeway in exchange for the preservation and creation of wetlands on less valuable residential property (a portion of which continues to serve as part of plaintiffs' flood control and flood detention facilities and has been incorporated into open space, parks and biking paths, as amenities). Mr. Smith, however, only evaluated the economic impact of the relevant parcel containing only 195.84 acres of wetlands, as identified in the 1999 Permit. He did not analyze the additional ±25 acres

that plaintiffs claim were taken by virtue of the Deed of Restrictions. Although plaintiffs may argue that this failure makes Mr. Smiths' appraisal faulty, it does not make it fatally so. The court can utilize Mr. Kimmel's valuation to determine the fair market value of these additional ±25 acres to complete the analysis.

These ±25 acres of land that constitute the difference between what the 1999 Permit required to be set aside as mitigation and preservation wetlands, and what plaintiffs are claiming have been taken by virtue of the Deed of Restrictions, encompass area C–1, approximately fourteen acres of the North Channel, and a few small, additional acres of water areas. Mr. Kimmel, plaintiffs' expert, determined that these areas would be best suited for residential development. Accordingly, Mr. Kimmel calculated that such areas would be worth $60,000 per acre. Using this figure, the fair market value of the additional ±25 acres would be approximately $1,500,000. Thus, in taking what defendant's expert, Mr. Smith, calculated the fair market value of the 195.84 wetland acreage identified in the 1999 Permit to be after the date of the taking—that figure being an *increase* in fair market value of $14,899,907– and subtracting the loss in fair market value of the additional ±25 acres of land from the Deed of Restrictions that Mr. Kimmel calculated was worth $1,500,000, plaintiffs still maintained a *net increase* in fair market value of approximately $13,400,000 by virtue of the issuance of the 1999 Permit and Deed of Restrictions. The court cannot ignore the fact that, as a result of the permit issuance, plaintiffs were able to fill valuable commercial acreage in exchange for maintaining and preserving less valuable residential land. Thus, plaintiffs' assertion of severe economic impact is wholly baseless.

In addition to his appraisal evaluating the actual circumstances created as a result of the issuance of the 1999 Permit, Mr. Smith also conducted an hypothetical appraisal— one encompassing what the government believes is plaintiffs' theory of the case. Defendant believes that plaintiffs' underlying theory of this matter is that in addition to the mitigation wetlands required to have been created under the 1999 Permit, plaintiffs

should be compensated for all of the mitigation wetlands, whether delineated in 1988, 1991 or created pursuant to the 1999 Permit. In other words, defendant asserts that plaintiffs not only claim a taking of the lands required to be maintained as wetlands under the 1999 Permit and Deed of Restrictions, but also a taking of all the lands delineated in 1991 and 1988, regardless of whether plaintiffs had a reasonable investment-backed expectation in these lands, and regardless of whether these lands were subsequently impacted and developed.

Assuming that defendant's assertion is accurate and that the government has aptly described plaintiffs' theory, such a theory might be viable if plaintiffs had claimed that the date of the alleged taking was at the time of the 1988 or 1991 delineations. The court might then adopt plaintiffs' theory that even the wetlands that were delineated in 1988 or 1991, but then were allowed to be filled and developed per the 1999 Permit, would be at issue for the economic impact analysis. However, the date of the alleged taking in this case is August 31, 1999, the date of the issuance of the 1999 Permit, not before. It would be illogical to include in the economic impact analysis those lands that had previously been delineated as wetlands in 1988 or 1991 that were allowed to be filled and developed as a result of the 1999 Permit.

Thus, although the court recognizes and acknowledges Mr. Smith's hypothetical opinion discussing what the economic impact of the relevant parcel would be should plaintiffs be compensated for all of the wetlands delineated in 1988 and 1991, regardless if those wetlands were allowed to be developed under the 1999 Permit, the court finds such an analysis unnecessary. Because the date of the taking in this case is August 31, 1999, and not at the time of the 1988 or 1991 wetland delineations, such a hypothetical analysis is rendered moot. Plaintiffs were allowed to fill valuable wetland areas in exchange for setting aside mitigation wetlands. To calculate the economic impact of the relevant parcel as if the taking claim included all of the wetlands delineated in 1988 and 1991, might have been appropriate in evaluating a temporary takings claim, however plaintiffs have voluntarily and specifically dismissed their temporary takings claim from this action.

### 3. The Economic Impact and Percentage Diminution of Value of the Relevant Parcel

Having adopted a modified version of the economic analysis approach utilized by Mr. Smith, the court will now discuss the economic impact of the 2280–acre relevant parcel as a result of the issuance of the 1999 Permit and the Deed of Restrictions.

There have been a number of occasions where this court and the Federal Circuit have discussed what constitutes a severe economic impact requiring the taking of private property to be compensated. Many cases focus on the opposite side of the spectrum— what does not constitute a severe economic impact. For example, in *Rockefeller Center Properties v. United States,* 32 Fed.Cl. 586, 594 (1995), this court calculated the percentage diminution in value occasioned by the government imposition to be *de minimis* with respect to the economic impact prong. In that case, plaintiff claimed that a compensable taking had occurred when the government's executive orders prevented a lessor's right to evict an agency of the Yugoslavian government for failure to pay rent, and to be able draw on a letter of credit. *Id.* at 589. The *Rockefeller Center* court, in calculating the percentage diminution of value occasioned by the governmental action, determined that plaintiff lost rent for allegedly 4.3% of the total time that the Yugoslavian government occupied the leased premises. *Id.* at 594. The court stated:

> Once plaintiff regained possession, it was able to seek a new lessee for the premises and to thereby gain an economic benefit from its property. Based on the foregoing, we conclude that the economic impact of the blocking order on [plaintiff's] lease rights ... was not particularly severe, and, in fact, *de minimis*, at best.

*Id.*

Similarly in *Maritrans Inc. v. United States,* the Federal Circuit stated that a 13.1% reduction in economic value was not enough of a diminution to indicate that Maritrans was carrying an undue portion of the

burden created when the double hull requirement of the Oil Pollution Act of 1990 rendered Maritrans unable to use its single hull tank barges. 342 F.3d 1344, 1358 (Fed.Cir. 2003). This court found that Maritrans' property declined in value by 13.1% due to the regulatory imposition, but that this was not enough of a diminution in value to support its takings claims for eight of the vessels. *Maritrans Inc. v. United States,* 51 Fed.Cl. 277, 283 (2001). The Federal Circuit agreed, stating that "Maritrans was able to regain a significant portion of its initial investment in the tank barges. In short, Maritrans has not shown that the court's findings on economic impact are clearly erroneous. Thus, the degree of economic impact arising from OPA90's double hull requirement is a factor that also weighs against Maritrans' takings claims." 342 F.3d at 1358.

In *Bass Enterprises Production Co. v. United States,* 54 Fed.Cl. 400, 401 (2002), plaintiffs claimed that they were entitled to just compensation for a temporary taking of their oil and gas leases. Plaintiffs owned the right to extract oil and gas from a 1952 lease. However, Congress passed the Waste Isolation Pilot Plant (WIPP) Land Withdrawal Act in 1992 to obtain land from the public domain for nuclear waste disposal and to establish a regulatory framework to govern the site. *Id.* Subsequently, plaintiffs submitted applications for permits to drill wells in the WIPP area, but the Bureau of Land Management denied those applications in August 1994. On plaintiffs' motion for reconsideration, the court determined that the economic impact of the temporary taking, as a result of the permit denials, caused a 5% decrease in the value of property. *Id.* at 404. The court arrived at this figure by looking at the adjusted cash flow for the delay period, which was $22.5 million. *Id.* The court reasoned:

> The difference between the present values of the $22.5 million with and without consideration of the delay was $2.6 million. We applied an interest factor to the lost cash flow of $2.6 million to determine fair compensation for the forty-five-month delay. Plaintiffs argue that our finding that the economic impact was $1,137,808 establishes this factor in its favor.

. . . .

The denominator in this case would be at least $22 million. The diminution in value can be measured only by the forty-five-month delay. The cost of the delay was approximately $1.1 million. Using that measure, plaintiffs' economic impact is five percent of the value of their property.

*Id.* Thus, the court found that though plaintiffs had reasonable investment-backed expectations, the negligible economic impact negated the possibility that plaintiffs could prevail on a takings theory. *Id.*

Similarly in *Cane Tennessee, Inc. v. United States,* 57 Fed.Cl. 115, 125, 129 (2003), this court found that, with respect to one property, as much as a 49.6% diminution of value did not result in a severe economic impact. *Id.* at 125. The Supreme Court has denied finding a taking where the diminution of value was 46%. *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993) (a 46% diminution in value resulting from a pension plan regulation did not support a compensable taking). However, the court in *Yancey* noted that there is no automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value. 915 F.2d at 1541 (finding a taking in the case of a 77% diminution of value). At a minimum, a plaintiff must show a "serious financial loss" for there to be a taking. *Cienega Gardens,* 331 F.3d at 1341.

In *Florida Rock,* this court held that a 73.1% diminution of value with no chance for recoupment of plaintiff's investment constitutes a taking. 45 Fed.Cl. at 38. In *Florida Rock,* the Army Corps of Engineers rejected Florida Rock's Section 404 permit application to dredge and fill wetlands. Using the defendant's comparable sales method, but then making upward adjustments based on other factors such as the presence of roads on the property and the presence of state and local permits, the court found that Florida Rock suffered a severe economic loss, especially in light of the fact that Florida Rock was singled out to bear a heavier burden than its neighbors, whose limestone mines were still

allowed to operate, and in light of the fact that "plaintiff could have recovered barely half of its inflation adjusted investment in the subject property." *Id.*

In this instance, we have agreed with Mr. Smith's determination that the issuance of the 1999 Permit *increased* the value of the relevant parcel by $14,899,907. Before the date of the alleged taking, Mr. Smith calculated the fair market value of the 2280–acre Development to be $33,105,963. After the date of the alleged taking, the 2280–acre relevant parcel increased in value to $48,005,870. Mr. Smith explained this increase in the following analysis:

> The increase in value is attributable to the 62.98 acres allowed to be filled (developed) by the ... permit (8/31/99) being "ripe" for office/light industrial development. This acreage and additional upland fingers that were undevelopable in the "before" were sold after August 31, 1999 for $6.50/sq. ft. The 62.98 acres located within Detention Basin C–1 identified for creation of wetlands contained only 30 developable acres. The 30 developable acres had future residential development potential, but would have a significantly lower value as of August 31, 1999.

> The implications of the U.S. Army Corps of Engineers' Permit No. 199825043 on the actual sales of the property as of August 31, 1999, recognizing the existing legal and physical restrictions on the property, were financially positive.

Def.'s Ex. 255 at 75.

Mr. Smith, whose analysis this court adopts, came to this conclusion because the issuance of the 1999 Permit allowed plaintiffs to fill valuable commercial property and develop that property in exchange for setting aside other, less valuable property for mitigation. Unlike in prior cases where there has been a slight decrease in value after the date of the taking, in this case the court is faced with the situation of an *increase* in economic value.

Even taking into account the approximately twenty-five acres of land that Mr. Smith failed to consider in his economic analysis— that acreage constituting the additional acreage claimed to have been taken by virtue of the Deed of Restrictions—the court nevertheless finds an overall increase of economic value of the entire subject property as a result of the issuance of the 1999 Permit.

### 4. Plaintiffs' Ability to Recoup Their Investment

The severity of the economic impact of the 1999 Permit and the Deed of Restrictions appears at most to be *de minimis*, especially in light of the fact that plaintiffs' ability to recoup their investment was extremely high. The Federal Circuit in *Maritrans* observed that "the owner's opportunity to recoup its investment or better, subject to the regulation, cannot be ignored." 342 F.3d at 1354 (citing *Rith Energy*, 247 F.3d at 1363); *see also Florida Rock*, 45 Fed.Cl. at 38 ("In determining the severity of the economic impact of the permit denial, the court must also take into account whether [the plaintiff] was able to recoup its investment subject to the regulation.") (citing *Florida Rock*, 18 F.3d at 1567). Although this court recognized in *Cane Tennessee* that "recoupment" is not a required measure of economic impact, it can sometimes be relevant. 57 Fed.Cl. at 123. In that regard, the *Cane Tennessee* court noted that "if a party were able to recoup its investment after the government action, it is less likely that a taking has occurred." *Id.* (citing *Walcek*, 303 F.3d at 1357). However, the *Cane Tennessee* court opted not to look at plaintiffs' ability to recoup its investment, stating that "[t]he court believes that the proper measure of economic impact is a comparison of the market value of the property immediately before the governmental action with the market value of that same property immediately after the action." *Id.* (citing *Keystone*, 480 U.S. at 497, 107 S.Ct. 1232).

In *Maritrans*, the Federal Circuit found under the *Penn Central* economic impact analysis that plaintiff was able to regain a significant portion of its initial investment in tank barges despite a regulation infringing upon Maritrans' ability to use its single hull vessels. 342 F.3d at 1358. Despite Maritrans' argument that it lost 100% of the useful life of its vessels after the regulatory imposition, the Federal Circuit agreed that Maritrans' ability to regain its investment

and the overall degree of economic impact, a 13.1% decline in value, weighed against Maritrans' takings claim. *Id.* Similarly in *Carolina Power & Light Co. v. United States*, 48 Fed.Cl. 35 (2000), this court found that, despite an assessment imposed on certain domestic utilities under the Energy Policy Act of 1992, plaintiff had a high ability to recoup its assessment from ratepayers. *Id.* at 47. The court determined that this was a "significant" factor in *Penn Central's* economic impact analysis and specifically noted that "the Supreme Court has established that mitigating factors are significant in determining whether a statute effects a taking." *Id.* (citing *Penn Central*, 438 U.S. at 137, 98 S.Ct. 2646) (holding that plaintiff's ability to recoup lost profits through transferred development rights mitigated financial burdens imposed by law). Conversely, in *Florida Rock*, this court, on remand, found that based on expert testimony, plaintiff could have recovered barely half of its inflation-adjusted investment in the subject property. 45 Fed.Cl. at 38. Overall, the court found that Florida Rock suffered a severe economic impact when the Corps denied plaintiff's application for a dredge and fill permit. *Id.* The value of its 98–acre parcel of land, for which the permit was denied, was diminished by almost three-fourths, which was exacerbated by the fact that plaintiff was unable to recoup its investment in the property by selling it. *Id.*

In this instance, it is clear that plaintiffs recouped their investment, and then some, from the time that the 1999 Permit was issued until trial. The issuance of the 1999 Permit gave plaintiffs the ability to fill approximately sixty-three acres of valuable commercial property on the Commercial portion. Once this land was filled, the land became developable and subsequently was sold off to various private purchasers in the three-phased community. Plaintiffs' initial investment in the South Meadows development was nearly $35 million. Up to the date of the alleged taking, plaintiffs' sales of various parcels in the South Meadows development totaled over $117 million. After the issuance of the 1999 Permit, up through July 2, 2002, plaintiffs had sales in excess of $170 million. In *Tabb Lakes, Inc. v. United States*, 26 Cl.Ct. 1334, 1352 (1992), *aff'd*, 10 F.3d 796 (Fed.Cir.1993), the Claims Court found that plaintiff there "had substantial economically beneficial use of this property" during a three-year period when total receipts from lot sales were nearly $2 million. *Id.* "Although defendant notes that the court need not look at profits in order to satisfy a finding of economic viability, defendant points out that plaintiff has not suffered a substantial deprivation .... The undisputed facts of record support a finding that any losses suffered by plaintiff could amount to no more than a mere diminution in value." *Id.* Likewise, in this case, plaintiffs' demonstrated ability to recoup their investment weighs heavily against finding a taking.

### 5. Lost Profits

Plaintiffs also argue that the economic impact resulting from the 1999 Permit and Deed of Restrictions has been exacerbated by the lost profits plaintiffs suffered. Plaintiffs presented evidence at trial that the Normans' profits on the entire project from 1992 to 1999 totaled $55,189,600. This amount, plaintiffs argue, was far less than plaintiffs' expected profits of $150 million for the Double Diamond Ranch project. Thus, plaintiffs claim lost profits of $94,810,400.

In *Yancey v. United States*, 915 F.2d 1534 (Fed.Cir.1990), the Federal Circuit recited the general rule that "the Supreme Court has specifically addressed and rejected the availability of lost profits under the Fifth Amendment." *Id.* at 1542 (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379, 65 S.Ct. 357, 89 L.Ed. 311 (1945) (stating that "compensation for the interest does not include future loss of profits")). In *Yancey*, plaintiffs sought to recover compensation for turkey breeder stock that was sold for slaughter as a result of a quarantine imposed to control and eradicate an outbreak of influenza, despite such stock not being diseased. Plaintiffs argued that the interstate quarantine destroyed the stock's economic value. The Federal Circuit stated that the fair market value should be used to determine the amount of compensation, with the "fair market value" being the price at which property would change hands in a transaction between a willing buyer and a willing seller. *Id.* The government argued that the

Claims Court gave the Yanceys an impermissible bonus for lost profits. *Id.* The Federal Circuit noted that "the fair market value of a property *can* also include an assessment of the property's capacity to produce future income if a reasonable buyer would consider that capacity in negotiating a fair price for the property." *Id.* (emphasis added) (citing *Yachts Am. v. United States,* 779 F.2d 656, 660 (Fed.Cir.1985), *cert. denied,* 479 U.S. 832, 107 S.Ct. 122, 93 L.Ed.2d 68 (1986)). However, the Federal Circuit found that in that particular instance, the government's fair market value analysis was rightly calculated without including the future income potential of plaintiffs' flock. *Id.*

In *Forest Properties, Inc. v. United States,* 177 F.3d 1360, 1367 (Fed.Cir.1999), the Federal Circuit reaffirmed that the measure of economic impact requires an analysis of the change in the fair market value of the property as a result of the regulation. *Id.* Plaintiff there attempted to demonstrate a severe economic impact to its property when plaintiff was denied a Section 404 dredge and fill permit since the denial of the permit rendered Forest Properties unable to dredge and fill its property and sell the dredged lots for profit. *Id.* However, the Federal Circuit found that Forest Properties' anticipated selling prices for the lots was not an indication of the fair market value of the lots immediately after the permit was denied. *Id.* "This was not evidence of the amount by which the fair market value of the [property] was reduced by the denial of the permit." *Id.* (citing *Loveladies,* 28 F.3d at 1178). "The profit that Forest [Properties] allegedly lost does not necessarily reflect the reduction in market value the denial of the permit caused." *Id.*

It is the same logic that the Federal Circuit utilized in *Forest Properties* that applies in the case at bar. Regardless of any perceived loss of future profits or potential return on investment plaintiffs proclaim could have been received, such lost profits are not the metric for determining the economic impact under *Penn Central.* Rather, the determination involves a calculation of the fair market value before and after the date of the alleged taking. This calculation does not include a hypothesis of potential future income. Furthermore, the fair market value of the property would in and of itself already incorporate future income potential into the purchase price. Market forces normally would already factor in that potential. Accordingly, the court does not find plaintiffs' claim for future lost profits to have a bearing on economic impact.

In addition to these aforementioned alleged lost profits, Don Norman testified that his personal economic losses as a result of the Corps' actions between 1988 and 1994 were $33 million. "I started out with a net worth of $30 to $33 million. And by the time '94 came around, we were completely out of money." Tr. at 494. "[I] sold everything. My son sold everything, I mean, he was down to a truck we were sharing. I had borrowed an El Camino from an ex-girlfriend who was a business partner." *Id.* "We were completely broke by 1993 . . . . We went from $30 to $33 million to zero." *Id.* at 495. There was testimony that the Normans also spent $1.5 million to form the South Meadows Partnership. Lance Gilman testified that his losses between 1988 and 1995 were approximately $15 million. These losses are in addition to the $34.2 million plaintiffs are claiming as damages for their takings claim.

Plaintiffs set forth this testimony in an effort to further demonstrate the allegedly severe economic impact of the 1999 Permit. However, plaintiffs' attempt to demonstrate plaintiffs' alleged economic hardship in this way is weakened by plaintiffs' failure to actually prove such losses at trial. The testimony of plaintiffs, alone, does not suffice to prove these losses. Don Roger Norman's proclamation regarding the loss of his "son's house, his cars, his hangar, my hangar" and "the plane" is not sufficient to prove these losses and, more importantly, is not relevant to the economic impact analysis under *Penn Central* for it does not show the fair market value of the property at issue before and after the taking. *Forest Props.,* 177 F.3d at 1367. Plaintiffs' personal losses throughout the course of the South Meadows development Phases I, II and III are not relevant to calculating the economic impact of the regulatory imposition imposed, especially given

the dearth of evidence presented at trial to substantiate such losses.

Prior to trial, defendant sought permission from the court to introduce evidence of plaintiffs' tax history to refute plaintiffs' personal losses claim at trial and in response to plaintiffs' attempt to "resurrect the issue of the impact of the government's redelineation on the Normans' personal financial situation." *See* May 22, 2003 Order. Defendant's position was that a profitability analysis of the federal tax returns and general ledgers would have captured all of the business losses and profits the Normans and the South Meadows Partnership suffered through 2001. The court denied defendant's request that the government be allowed access to plaintiffs' tax returns. Instead, the court granted defendant's alternative request that plaintiffs be prohibited from presenting any evidence of alleged personal losses of income from 1988 until 1999.

However, plaintiffs continued to assert that the court must hear their whole story and continued to express their desire to present evidence regarding the alleged unfairness of the 1991 delineation and possible nefarious motivations of the government. As a result of the pretrial conference held November 13, 2003, the court determined that the parties should be permitted to introduce evidence regarding the plaintiffs' personal financial losses from 1988 through the date of the alleged permanent taking in 1999, for the limited purpose of demonstrating or refuting the alleged economic impact caused by the regulatory imposition. *See* Nov. 18, 2003 Order. The parties were afforded the opportunity to present evidence concerning plaintiffs' initial purchase price and capital expenditures made with respect to the subject property, and profits from sales of various portions of the property.

At trial, defendant set forth testimony from Mr. Gregory Polonica regarding profits and losses that should be reflected in the South Meadows Partnership books and records. Mr. Polonica is an expert in the field of accounting, working in the corporate finance unit of the antitrust division of the United States Department of Justice (DOJ). At trial, Mr. Polonica testified that the South Meadows development was highly profitable. "The partnership as an entity has generated revenues in excess of $81 million." Tr. at 1644. "According to the partnership's tax returns, the partners have received distributions through December 31, 2001 totaling over $70 million." Def.'s Ex. 273 ¶ 29. Mr. Polonica's expert report further explains that additional distributions can be expected in subsequent years.

The court does not find plaintiffs' tax gain and losses relevant for determining the economic impact suffered by the property. First, because plaintiffs' personal economic losses do not bear on calculating fair market value, such evidence regarding plaintiffs' tax gain and losses is not needed for the court's evaluation of the economic impact on the property. Second, at least one of the Court of Federal Claims' decisions has suggested that the court should not give deference to tax losses and gains in the ambit of takings claims. For example, in *American Pelagic Fishing Co. v. United States*, 55 Fed.Cl. 575 (2003), defendant contended that because plaintiff's books and records reflected a tax gain when plaintiff's vessel was sold, plaintiff was not harmed by a taking. *Id.* at 591. The court dismissed this argument stating "[t]he fact that there may have been a paper gain does not mean plaintiff did not suffer a ... taking." *Id.*

Third, and quite significantly, the parties themselves, in their post-trial submissions to the court, dismiss the propriety of delving into plaintiffs' tax returns for purposes of calculating economic impact. Plaintiffs state that they "are aware of no decision giving consideration to the tax implications of government takings of land." Pls.' Resp. to Ct.'s Post–Trial Questions at 95. Defendant also states that "[t]he profitability analysis has no relation to the calculation of fair market value. It is simply another way of looking at economic impact of government action on the South Meadows development." Def.'s Resp. to Ct.'s Post–Trial Questions at 29. Accordingly, the court does not deem it necessary to include plaintiffs' tax gains and losses for the purpose of evaluating economic impact.

### c. Character of the Governmental Action

The court lastly considers the purpose and importance of the public interest reflected in the regulatory imposition. *Cienega Gardens*, 331 F.3d at 1337. In analyzing this criteria, "courts must inquire into the degree of harm created by the claimant's prohibited activity, its social value and location, and the ease with which any harm stemming from it could be prevented." *Walcek*, 49 Fed.Cl. at 270 (citing *Creppel*, 41 F.3d at 631); *see also Forest Props.*, 177 F.3d at 1366; *Loveladies*, 28 F.3d at 1179. The court must balance the liberty interest of the private property owner against the government's need to protect the public interest through imposition of a restraint. *See Cienega Gardens*, 331 F.3d at 1338 (citing *Loveladies*, 28 F.3d at 1176); *see also Bass Enters. Prod. Co. v. United States*, 54 Fed.Cl. 400, 403 (2002) (stated that the court must weigh the purpose and importance of the public interest reflected in the regulatory imposition and balance plaintiff's interests against the government's need to protect); *Rockefeller Ctr. Props. v. United States*, 32 Fed.Cl. 586, 591 (1995) (finding that the blocking of a foreign government's property by the president under authority granted by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq.* (2000), to deal with national security and foreign policy clearly serves the public interest to deal effectively with international events, and militates against finding that a taking occurred).[17] Sometimes the character of the governmental action prong propels inquiries as to whether the government's action is analogous to a physical invasion of property. *Brace v. United States*, 48 Fed.Cl. 272, 278 (2000) (citing *Forest Props.*, 39 Fed. Cl. at 67). In this case, plaintiffs have actually asserted a physical taking of 220.85 acres of property and the court has already disposed of that argument as being without merit.

It is important to note from the onset that there is no contention surrounding the government's legitimate public welfare obligation to preserve the nation's wetlands. *See Brace*, 48 Fed.Cl. at 279; *Forest Props.*, 39 Fed.Cl. at 76. Wetlands fulfill vital functions important to the environment and public interest, such as (1) water purification and water quality enhancement functions; (2) storage areas for storm and flood waters; (3) natural biologic functions, such as food chain production, general habitat, and resting sites for aquatic or land species; and (4) erosion and sedimentation control functions. *See* 33 C.F.R. § 320.4(b)(2) (2004); 40 C.F.R. § 230.41(b) (2004) ("The discharge of dredged or fill material in wetlands is likely

---

17. Some courts look to the purpose and importance of the public interest underlying the regulatory imposition, focusing, in particular, on whether the challenged restraint would constitute a nuisance under state law. *Walcek*, 49 Fed.Cl. at 270; *see also Loveladies*, 28 F.3d at 1182 (stating that the inquiry is whether the regulatory imposition goes beyond the government's powers under common law nuisance doctrine, and thus, constitutes a taking). The general notion is that if an activity constitutes a private nuisance, then the government has the right to prevent it, since the activity was never part of the property owner's bundle of rights from the onset. *Loveladies*, 28 F.3d at 1182–83 (stating that the inquiry is whether the state retained the power to impose a particular regulatory framework upon private property owners, as a matter of state property law based on traditional common law nuisance principles); *see also Forest Props.*, 177 F.3d at 1366 (stating that the trial court correctly found that dredging and drilling of the submerged area to permit its use for building would not constitute a nuisance under California law); *Appolo Fuels*, 54 Fed.Cl. at 734 (stating that "if the [g]overnment shows that the activity it was regulating constituted a nuisance in the state's common law, it can avoid paying compensation because the right to engage in the activity was excluded from the owner's title").

In this particular instance, it is not necessary for this court to conduct an inquiry as to whether plaintiffs' conduct would constitute a nuisance under Nevada law. The Federal Circuit in *Appolo Fuels* noted that "[i]t is a settled principle of federal takings law that under the *Penn Central* analytic framework, the government may defend against liability by claiming that the regulated activity constituted a state law nuisance without regard to the other *Penn Central* factors." 381 F.3d at 1347. In *Appolo Fuels*, the Federal Circuit found it unnecessary to resolve whether Appolo Fuels' activity would have constituted a nuisance under Tennessee law because the Federal Circuit concluded that there had been no taking under the *Penn Central* analysis, apart from any nuisance defense. *Id.* In the case at bar, the government does not raise the nuisance defense and the parties have not addressed it in their filings nor at trial. The parties and the court here, instead, appropriately focus upon the *Penn Central* ad hoc analysis.

to damage or destroy habitat and adversely effect the biological productivity of wetlands ecosystems."). The parties are not challenging whether the preservation of wetlands through the Corps' implementation of the Clean Water Act serves to advance legitimate state interests. Plaintiffs are not challenging the government's permitting power. The Supreme Court has made it clear that the Corps has broad authority to regulate discharges into wetlands. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 138, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 904 (Fed.Cir.1986); *Forest Props.,* 39 Fed.Cl. at 77. The Corps' authority to require a permit to fill and dredge wetlands also includes the Corps' authority to require that the party seeking to fill and dredge wetlands create mitigation wetlands. *See Walcek,* 49 Fed.Cl. at 248 n. 10 ("Mitigation of the destruction of wetlands by creation or enhancement of other wetland areas is typically required by the Corps, as a condition for the issuance of a Section 404 permit.").[18]

In *Riverside Bayview,* the Supreme Court ruled on whether the Clean Water Act, together with regulations promulgated under its authority by the Corps of Engineers, authorized the Corps to require landowners to obtain permits prior to discharging fill material into wetlands for areas adjacent to "waters of the United States." 474 U.S. at 121, 106 S.Ct. 455. In that opinion, the Supreme Court gave an extensive overview of the Clean Water Act and the Section 404 permitting process, which aids the court here. The Supreme Court opined:

> A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner.

*Id.* at 127, 106 S.Ct. 455.

At the same time, it is also important to note that it is not enough that the government's purpose in protecting the environment be worthy. *See Cane Tenn.,* 57 Fed.Cl. at 128. As the Federal Circuit has stated, "[t]he disproportionate imposition on the Owners of the public's burden ... is not rendered any more acceptable by worthiness of purpose." *Cienega Gardens,* 331 F.3d at 1340. It is not within Congress' power to promote a purpose, such as protecting the environment, without also providing compensation if the regulation to achieve the goal, as to a particular plaintiff, "goes too far." *See Cane Tenn.,* 57 Fed.Cl. at 128 (citation omitted). The inquiry is whether "the burden for remedying the societal problem has been imposed on all of society." *Cienega Gardens,* 331 F.3d at 1340.

In the case at bar, plaintiffs craft the character of the governmental action prong in terms of whether the alleged taking is akin to a physical taking by virtue of the fact that

---

18. The Code of Federal Regulations discusses a multitude of mitigation methods under the Section 404 permitting process. *See* 40 C.F.R. §§ 230.70–.77 (2004). The Corps has regulatory authority to require compensatory mitigation at on-site or off-site locations. 33 C.F.R. §§ 230.4(r)(1), (2) (2004). *See also* Corps of Engineers, Department of the Army, Final Rule for Nationwide Permit Program Regulations and Issue, Reissue, and Modify Nationwide Permits, 56 Fed.Reg. 59,110, 59,146 (Nov. 22, 1991). The Corps can also consider project modifications that are considered feasible, such as reductions in scope of the project, changes in construction methods, etc. 33 C.F.R. § 230.4(r)(i). The Corps derives its mitigation authority from 33 U.S.C. § 1344(b)(1).

Effective February 7, 1990, the Corps and the EPA entered into a Memorandum of Agreement Concerning the Determination of Mitigation under the Clean Water Act Section 404(b)(1) Guidelines (Feb. 7, 1990) (Mitigation MOA). Theda Braddock Fowler, *Wetlands Regulations: Case Law Interpretation and Commentary* 273 (Government Institutes 2003). The Mitigation MOA contains a detailed exposition on the mandatory sequence of analysis of when considering applications for individual permits which involve issues of compliance with the guidelines. *Id.* The Mitigation MOA recognizes that the national goal of no net loss of wetlands functions and values may not be achieved in every individual permit action. *Id.* The Corps and EPA consider mitigation to be an important aspect of the review and balancing process on many Section 404 permit applications. *Id.* at 116.

plaintiffs were required to permanently transfer title to 220.85 acres of land to the South Meadows Association in order to obtain a permit to fill and dredge wetlands. Plaintiffs also argue that the loss suffered by plaintiffs should be borne by the public as a whole, and "not the innocent purchasers, the Normans." Pls.' Post–Trial Brief at 32. To support their position, plaintiffs rely on *Florida Rock*, 45 Fed.Cl. at 42, where this court, on remand from the Federal Circuit, concluded that the denial of a Section 404 permit to mine limestone essentially constituted a physical taking. In that regard, this court reasoned that "[t]he government might as well have physically occupied the property, leaving Florida Rock the option of visiting its land for recreation, or selling it." *Id.* The *Florida Rock* court stated:

> There is little dispute that the purpose of the regulatory action of permit denial was to enhance the water and ecological system of the United States and south Florida in particular by preserving more wetlands. It was to benefit the public, not prevent Florida Rock from doing any harm. Rock mining is widespread in this region of Florida. The only difference between this property and various other mining operations, as the court observed on the site view, is that it was west of an arbitrary line the government decided upon as the limit of wetland protection. Unlike the traditional nuisance case where the government prevents what the citizen had no right to do under the common law, here the activity was perfectly permissible until the permit was denied. Florida Rock's activity posed no health or safety risk. The government made a permissible policy choice that this land should benefit the public's supply of wetlands.

*Id.* at 40. The *Florida Rock* court found that the plaintiff's activity was otherwise permissible under state nuisance principles. Specifically, the *Florida Rock* court found that rock mining would cause only superficial pollution and therefore did not constitute a public or private nuisance under Florida law, and that other landowners in the vicinity had been allowed to operate rock quarries. *Id.* at 30. In line with *Florida Rock*, in the case at bar, plaintiffs maintain that the severity of the intrusiveness, coupled with their contention that plaintiffs have been singled out to bear a public burden, lends to finding that the character of the governmental action supports a taking here.

Defendant, on the other hand, argues that the character of the government's action does not establish that a taking occurred in this case. First, defendant claims that the Corps conformed the 1999 Permit to plaintiffs' proposals and allowed plaintiffs to develop the vast majority of their property for profit. Second, the government argues that the government has a legitimate public welfare duty to preserve the nation's wetlands. *See Forest Props.*, 39 Fed.Cl. at 76.

Third, the government argues that the issuance of a Section 404 permit under the Clean Water Act is considered a proper government action. Defendant argues that the presumption of lawful and proper government action applies where claimants have failed to challenge the agency's actions in federal court. Because plaintiffs did not challenge the lawfulness of the issuance of the 1999 Permit in federal district court under an administrative review proceeding, defendant argues, the character of the government action here was inherently appropriate. However, the court finds this argument is inapposite. First, it is well established that a takings claim is valid, so long as the underlying governmental action was authorized, even if the government's action was subject to legal challenge on some other ground.[19]

---

**19.** In *Del–Rio Drilling Programs, Inc. v. United States*, the Federal Circuit held that the plaintiff could bring a takings claim without first challenging the lawfulness of the government's action, or establishing the scope of its property interest, in an administrative proceeding. 146 F.3d 1358, 1364–65 (Fed.Cir.1998). However, if a party first challenges the appropriateness and lawfulness of the action in an administrative proceeding, and then loses that challenge, it cannot attempt to relitigate that challenge under the guise of a takings claim. *Rith*, 247 F.3d at 1365–66. The *Rith* court discussed whether the wrongfulness of a permit denial was appropriate to assert in a takings claim when Rith had already lost its challenge as to the lawfulness of the regulatory action with the respective agency. The Federal Circuit held that because Rith had already lost an administrative challenge to the suspension of its mining permit, it was not al-

*Rith,* 247 F.3d at 1365 (citing *Del–Rio Drilling Programs, Inc. v. United States,* 146 F.3d 1358, 1365 (Fed.Cir.1998)). Second, the court has already determined herein and in prior opinions that the legality of the issuance of the 1999 Permit itself is not at issue in this particular case. *See Norman,* 56 Fed.Cl. at 268. Third, the lawfulness or appropriateness of the governmental action is not akin to the character of the governmental action. As the Federal Circuit stated:

> [A]n uncompensated taking and an unlawful government action constitute 'two separate wrongs ... give rise to two separate causes of action,' and that a property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims.

*Rith,* 247 F.3d at 1365 (citing *Del–Rio,* 146 F.3d at 1364). The inquiries are separate and distinct and neither the government nor plaintiffs can successfully weld them into one determination.

In *Brace,* 48 Fed.Cl. at 278, the government issued a cease and desist order which prohibited Brace from operating a drainage system which would have disturbed natural habitat. The government specifically found that Brace was involved in dredge and fill operations without having been issued a Section 404 permit. Brace was ordered to cease and desist operation of the drainage system on the parcel and to restore a portion of the land to a prior condition exhibiting wetlands characteristics. *Id.* at 275. With respect to the character of the governmental action, Brace argued that he was singled out to bear a public burden that other property owners did not have. *Id.* The court, however, found that the government has a legitimate public welfare obligation to preserve wetlands and that the unnecessary destruction of wetlands violates environmental laws and is contrary

to public policy. *Id.* at 279. Thus, the court found that the government's actions in *Brace* were to protect plaintiff's wetlands and that there was no deficiency in the character of this governmental action. *Id.* at 284.

In *Maritrans,* the Federal Circuit found that the regulation at issue there, the Oil Pollution Act of 1990, which required that all newly constructed tank vessels be constructed with double hulls, did not impose a physical invasion or restraint upon Maritrans' tank barges, nor did it compel surrender of the barges. 342 F.3d at 1356. The Federal Circuit found, instead, that the regulation imposed a precondition with respect to use of the barges. *Id.* The *Maritrans* court noted that in *Andrus v. Allard* "the Supreme Court made clear that 'the denial of one traditional property right does not always amount to a taking.' " *Id.* (citing *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979)). Maritrans did not dispute that the government's interest in protecting the waterways of the United States from oil spills for environmental and navigational reasons was a permissible governmental goal. *Id.* at 1357. Rather, Maritrans argued that the regulation was passed for political reasons, instead of environmental concerns. *Id.* The Federal Circuit did not agree with Maritrans' reasoning. The court noted that Congress determined that the double hull requirement for barges was necessary to reduce the likelihood of high volume spills that would result in damaging pollution. *Id.* The court further noted that the regulation did not solely affect Maritrans. *Id.* Congress created the restrictions to apply uniformly across the oil transport industry, thereby spreading the burden imposed by the statute over the entire industry. *Id.*

Similarly, in *Rith Energy, Inc. v. United States,* 270 F.3d 1347 (Fed.Cir.2001), the Federal Circuit, on Rith's petition for rehearing, held that, with respect to the nature of the governmental action, revocation of a coal

lowed to renew its challenge under the cover of a takings claim and was, instead, required to "litigate its takings claim on the assumption that the administrative action was both authorized and lawful." *Id.* at 1366. "In any event, in a takings case we assume that the underlying governmental action was lawful, and we decided only

whether the governmental action in question constituted a taking for which compensation must be paid. Rith's complaints about the wrongfulness of the permit denial are therefore not properly presented in the context of its takings claims." *Rith,* 270 F.3d at 1352.

mining permit was an exercise of police power directed at protecting the safety, health and welfare of the communities surrounding appellant's mine site by preventing harmful runoff. *Id.* at 1352. The Federal Circuit held that "[t]he exercise of the police power to address that kind of general public welfare concern is the type of governmental action that has typically been regarded as not requiring compensation for the burdens it imposes on private parties who are affected by the regulations." *Id.* (citations omitted). As in *Maritrans,* Rith also attempted to argue that it was unfairly singled out for disparate treatment, but the Federal Circuit found no basis for such a contention. *Id.* at 1352. Thus, the Federal Circuit found that the nature of the governmental action in *Rith* did not support finding that a compensable taking occurred. *Id.* at 1353.

In this instance, plaintiffs purchased their property while the Clean Water Act's permitting process and overall regulatory scheme were in effect, clearly making plaintiffs subject to the Act's requirements. The court goes on to observe that plaintiffs were not unfairly or disparately treated with respect to the Corps' overall wetlands permitting scheme. In fact, plaintiffs were never denied a permit to fill wetlands. *See Riverside Bayview,* 474 U.S. at 127, 106 S.Ct. 455 ("A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself 'take' the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired."). The 1999 Permit was granted on the condition that other mitigation wetlands be set aside for preservation, which is the mechanism normally utilized by the Corps to assure that when a Section 404 permit is issued to fill and impact wetlands, the net decrease in wetlands areas remains zero. The testimony of Charles Newling, former wetlands specialist at the Corps, explains this notion well:

> [I]n order to get a [Section 404] permit . . . the landowner or developer . . . has to demonstrate things in sequential order. The first would be the landowner had done everything possible to avoid filling in the wetlands in the first place. If he can demonstrate total avoidance is not possible. The second thing is that he would have to show that they had done everything they could to minimize the damage to the wetlands. It's called minimization. But if, after those first two steps, the Corps decides that it's still in the public interest to let the project move forward, there is a third step. The Corps may permit the applicant, the landowner, to fill a certain amount of wetlands; but it may not do that without compensating for the loss. . . . In other words, if I'm the landowner, and I get a permit to fill in one acre of wetland, I will have to make up the loss of functional values for that one acre by building some more wetland space someplace else, or restoring some more wetland someplace else, adequate, in the Corps' point of view, to compensate for the loss . . . . Mitigation.

Tr. at 451. The issuance of the 1999 Permit allowed plaintiffs to use over 2000 acres of the relevant parcel as desired in exchange for preserving 220.85 acres of wetlands. Plaintiffs, in essence, challenge the whole concept of mitigation at its core. In plaintiffs' world, no landowner would ever have to create mitigation wetlands in exchange for a fill and dredge permit under the Clean Water Act. The court does not find that the nature of the government action here, that being the Corps' requirement that plaintiffs preserve wetlands in exchange for filling others, is inappropriate simply because plaintiffs are unhappy with the mitigation plan they negotiated. This is true especially in light of the fact that the government has a legitimate public welfare obligation to preserve wetlands and that the unnecessary destruction of wetlands violates environmental laws and is contrary to public policy. *Brace,* 48 Fed.Cl. at 279.

The court also does not agree with plaintiffs' contention that the impact of the regulatory imposition here is akin to a physical taking of 220.85 acres of land and would otherwise demonstrate a severe interference by the government in plaintiffs' property rights. The court finds that the Corps' mitigation requirement is clearly a permissible regulatory imposition. In light of the entire

2280–acre relevant parcel, plaintiffs' overall bundle of property rights was not diminished with respect to the larger parcel at issue. In fact, plaintiffs were left in a better position to sell valuable commercial land in exchange for maintaining less valuable land which still added value to the 2280–acre Development in terms of storm drainage and flood control. Furthermore, there is no evidence that plaintiffs were unfavorably singled out by the Corps. Plaintiffs in this matter were never denied a Section 404 permit and the permitting process which pertained to both plaintiffs and DDH was applied fairly and even-handedly. The evidence presented at trial simply does not support plaintiffs' accusation that they were treated disparately by the Corps.

### d. Weighing of the *Penn Central* Factors

Upon weighing the three *Penn Central* factors in the regulatory takings analysis—the interference with reasonable investment-backed expectations, the economic impact, and the character of the governmental action—the court finds that no taking occurred. Plaintiffs' best case scenario is that it had reasonable investment-backed expectations in WL 17B which was the only portion of wetlands delineated after plaintiffs purchased the Commercial portion. Plaintiffs' investment-backed expectation in this mere 4.07 acres of the total 2280–acre Development area does not, however, support a taking, especially in light of the fact that the other two prongs of the *Penn Central* analysis, the economic impact and character of the governmental action, do not weigh towards finding a taking. The economic impact analysis of the relevant parcel reflected an *increase* in fair market value after the issuance of the 1999 Permit. There was no diminution of value of the parcel as a whole. With respect to the character of the governmental action, plaintiffs were never denied a permit to fill and dredge desired wetlands. The Corps' requirement that other wetlands be created or preserved to off-set the impact of existing wetlands is a perfectly permissible and standard mitigation technique—one that benefitted both the environment and plaintiffs. The Corps' action simply did not unduly burden plaintiffs.

## III. CONCLUSION

On this record, the court concludes that the Corps' issuance of the 1999 Permit, and the related Deed of Restrictions, resulting in 220.85 acres of plaintiffs' property being set aside as wetlands, did not effect a physical taking of plaintiffs' property nor a categorical taking of plaintiffs' property under the Fifth Amendment. Guided by the three-tiered *Penn Central* analysis, the court finds that, at best, plaintiffs maintained a *de minimis* reasonable investment-backed expectation in the claimed property. Furthermore, due to the lack of a severe economic impact and plaintiffs' failure to show that the nature of the governmental action in this instance unduly burdened plaintiffs or was otherwise inappropriate, the court finds that no regulatory taking of property has occurred.

As such, it is hereby **ORDERED** that the Clerk's office is directed to **ENTER** judgment for defendant, **DISMISSING** the Amended Complaint, filed January 15, 2004, with prejudice; and each party shall bear its own costs.

